2012 VT 80

**Long Trail House Condominium Association v. Engelberth Construction, Inc. v. Morgan's Roofing & Construction, et al.**

[59 A.3d 752]

No. 11-345

Present: **Skoglund and Burgess, JJ., and Kupersmith and Davenport, Supr. JJ., and Johnson, J. (Ret.), Specially Assigned**

Opinion Filed September 28, 2012

*Hans G. Huessy* of *Kenlan, Schwiebert & Facey, P.C.*, Rutland, for Plaintiff-Appellant.

*Robert R. McKearin, Shapleigh Smith, Wm. Andrew Mac-Ilwaine* and *Samuel Hoar, Jr.* of *Dinse Knapp & McAndrew, P.C.,* Burlington, for Defendant-Appellee Engelberth Construction, Inc.

¶ 1. **Skoglund, J.** This litigation stems from the construction of a 143-unit condominium complex known as the Long Trail House at Stratton Mountain, Vermont. Plaintiff Long Trail House Condominium Association appeals from the trial court's order granting summary judgment to defendant general contractor Engelberth Construction, Inc. on its complaint. The Association argues that the court erred in: (1) applying the economic loss rule to bar its negligence claim; and (2) dismissing its breach of implied warranty claim. We affirm.

¶ 2. In granting judgment to Engelberth, the trial court relied on the following undisputed facts. In January 1997, Stratton Corporation and Engelberth entered into a preconstruction agreement, which articulated preconstruction terms and services that Engelberth would supply to Stratton. This included recommendations on construction feasibility, consultation as to the selection of materials and equipment, assistance with zoning requirements and permits, and cooperation with the "design team" to provide valuable engineering services. Engelberth specifically disclaimed any "responsibility to ascertain that the Drawings and Specifications [were] in accordance with applicable laws, statutes, ordinances, building codes, rules and regulations," and disclaimed responsibility for the design team's designs, errors, or omissions.

¶ 3. In March 1998, the Stratton Corporation and Intrawest Corporation (collectively "Stratton") and Engelberth entered into a standard owner and contractor form agreement with modified general conditions, outlining the scope and terms of the project. This contract explicitly stated that it represented "the entire and integrated agreement between the parties hereto and supersede[d] prior negotiations, representations or agreements, either written or oral." The agreement provided that the contract documents "shall not be construed to create a contractual relationship of any kind" between anyone other than the owner and contractor.

¶ 4. The Long Trail House Condominium Association was incorporated in March 1999. Following completion of the construction project, it notified Stratton of alleged defects. Condominium owners had at first experienced minor problems, such as water

leakage. Structural engineers, however, found significant further damage that would likely lead to personal property loss and personal injury if not promptly remediated. This included: (1) water penetrating exterior walls; (2) improperly supported trusses, which could lead to roof collapse; (3) severe water damage to the balconies, which could result in their collapse within a year; (4) unsupported load-bearing walls that could collapse; and (5) improperly braced gable end walls in the roof area of both ·the North and South building that could collapse in a high wind event. The Association asserted that Stratton was responsible for repairing the damaged elements of the complex.

¶ 5. In May 2007, Stratton, Intrawest, and the Association entered into a "Settlement Agreement and Release of Claims" pursuant to which the parties settled the Association's design and construction defect claims for $7,025,000. The agreement required Intrawest to pursue a claim against Engelberth "to recover part or all of the payment paid to the Association under the Agreement." Stratton subsequently sued Engelberth, alleging that Engelberth was responsible for the construction defects in the buildings, the bulk of which were caused by water damage stemming from leaks throughout the building as a result of alleged faulty workmanship. As of March 2012, the Stratton/ Engelberth case was still in the discovery phase.

¶ 6. The Association thereafter retained contractors to conduct extensive remediation work. This work cost approximately $1,500,000 more than the settlement amount. In October 2008, the Association sued Engelberth, alleging that Engelberth was negligent in constructing the project and breached express and implied warranties by failing to construct and repair the project in a good workmanlike manner free of defects. The defects alleged by the Association mirrored those in Stratton's lawsuit, and included additional defects in the buildings' HVAC and electrical systems.

¶ 7. Based on these undisputed facts, the court concluded that Engelberth was entitled to summary judgment in its favor. As discussed in additional detail below, it concluded that the Association's negligence claim was barred by the economic loss rule and that the absence of contractual privity was fatal to the warranty claims. This appeal followed.

¶ 8. On review, we apply the same standard as the trial court. *Richart v. Jackson*, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000). Summary judgment is appropriate when, taking all allegations

made by the nonmoving party as true, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a); *Richart*, 171 Vt. at 97, 758 A.2d at 321. We conclude that summary judgment was properly granted to Engelberth here.

## I. Negligence and the Economic Loss Rule

¶ 9. We begin with the Association's negligence claim. In its complaint, the Association alleged that Engelberth owed it a duty to use "professional care" in performing general contractor services and in constructing the project, and that Engelberth could foresee with reasonable certainty that the Association would be injured by its failure to do so. According to the Association, Engelberth was careless and negligent in the performance of its duties, and failed to use the reasonable care, skill, and ability ordinarily required of general contractors. The Association alleged that as a result of Engelberth's negligence, it incurred significant cost and expense to remedy the defects resulting from Engelberth's failure to properly construct and/or repair defects in construction of the project.

¶ 10. The trial court concluded that the economic loss rule barred the Association's negligence claim. We agree. The economic loss rule "prohibits recovery in tort for purely economic losses." *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 30, 181 Vt. 513, 928 A.2d 497. The rule serves to maintain a distinction between contract and tort law. *Id.* As we have explained:

> In tort law, duties are imposed by law to protect the public from harm, whereas in contract the parties self-impose duties and protect themselves through bargaining. Thus, negligence actions are limited to those involving unanticipated physical injury, and claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract.

*Id.* (citations and quotations omitted); see also *Gus' Catering, Inc. v. Menusoft Sys.*, 171 Vt. 556, 558, 762 A.2d 804, 807 (2000) (mem.) ("Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm, which does not include economic loss." (quotations omitted)).

¶ 11. In this case, the Association sought economic damages for Engelberth's alleged negligence. As the trial court found, these damages consisted almost entirely of the costs of repair that stemmed from the alleged faulty construction, including: (1) replacement of certain components of the complex that were properly installed and undamaged but which needed to be removed and replaced as part of the remediation, such as siding; and (2) costs incurred in relation to water damage to interior walls and painted surfaces inside specific units. Indeed, the amount sought represented the difference in market value between the units as built and as they should have been built. As we stated in *Heath v. Palmer*, the remedy for purely economic losses resulting from "the reduced value or costs of repairs of . . . construction defects sound[s] in contract rather than tort." 2006 VT 125, ¶ 15, 181 Vt. 545, 915 A.2d 1290 (mem.).

¶ 12. The Association advances various reasons why the economic loss rule should not apply in this case. It first asserts that the rule does not apply unless the parties share contractual privity. According to the Association, the economic loss rule should not "strip a plaintiff of its tort remedies if the plaintiff has no other recourse and the defendant owed the plaintiff a duty." It complains that it had no opportunity to negotiate the allocation of the risks with Engelberth, and suggests that it did not have an alternate remedy here, notwithstanding its settlement with Stratton. The Association also argues that this case falls within the "professional services and/or special relationship" exception to the economic loss rule. Alternatively, it asserts that the rule is inapplicable because there was a threat of imminent harm.

¶ 13. We find these arguments unpersuasive. Privity, or lack thereof, is not the determining factor, nor are we persuaded that the rule's application turns on whether the parties had the opportunity to allocate risks, as the Association suggests. Instead, the focus is more appropriately on duty in cases such as this one. See generally S. Barrett, *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis*, 40 S.C. L. Rev. 891, 895 (1989) ("The crux of the [economic loss] doctrine is not privity but the premise that economic interests are protected, if at all, by contract principles, rather than tort principles."); see also *Gus' Catering, Inc.*, 171 Vt. at 558, 762 A.2d at 807. The exceptions to the economic loss rule advanced by the Association also turn on the existence of a duty separate and apart from a contractual

duty. We have recognized, for example, that there "might be recovery for purely economic losses in a limited class of cases involving violation of a professional duty." *EBWS*, 2007 VT 37, ¶ 30 (citation omitted). To fit within this exception, the parties must have "a special relationship, which creates a duty of care independent of contract obligations. . . . [T]he key is not whether one is licensed in a particular field . . . ; rather, the determining factor is the type of relationship created between the parties." *Id.* ¶ 31 (citation omitted).

■ ¶ 14. We have applied the economic loss rule in the absence of contractual privity, and the significance of a duty is apparent in those cases. In *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 312, 779 A.2d 67, 69 (2001), for example, the owners of commercial hydroelectric facilities sued former employees of the Vermont Power Exchange. They alleged that the employees negligently administered a power purchase agreement, which resulted in economic damages. *Id.* Rather than privity (which was lacking), we explained that "[t]he underlying analysis turns on whether there is a duty of care *independent* of any contractual obligations." *Id.* at 316, 779 A.2d at 71-72 (quotations omitted).

> [E]ven where courts have permitted recovery for economic loss, they have required a special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

*Id.* at 316, 779 A.2d at 71 (quotation omitted). In *Springfield*, we found that "neither privity of contract, nor a special relationship, exist[ed] between [the parties] which would permit a finding of duty on the part of [defendants]." *Id.* at 316, 779 A.2d at 72.

¶ 15. We conducted a similar analysis in *Hamill v. Pawtucket Mutual Insurance Co.*, 2005 VT 133, 179 Vt. 250, 892 A.2d 226. In that case, we considered whether an insured homeowner, Hamill, whose residence allegedly became uninhabitable due to water damage, had a cause of action in negligence against independent adjusters hired by his insurer to investigate the insured's initial claim. As in *Springfield*, there was no contractual relationship between the parties. We concluded that the adjusters owed no cognizable legal duty to the homeowner with respect to the

economic damages claimed, and that the homeowner's only remedy was against his insurer.

¶ 16. As in the instant case, Hamill asserted that because he was a foreseeably affected third party, the adjusters owed him a legal duty. He maintained that no sound public policy considerations justified denying his common-law negligence action against the defendant adjusters. We rejected these arguments. We explained that a cognizable legal duty in tort "depends on a variety of public policy considerations and relevant factors," where foreseeability is but one factor to be considered. *Id.* ¶ 6 (citing *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Amer. Ins. Co.*, 586 S.E.2d 586, 588 (S.C. 2003) ("Foreseeability of injury, in and of itself, does *not* give rise to a duty.")). "Ultimately, whether a duty exists is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake." *Id.* We stated that one "significant factor in determining whether there is a cognizable duty . . . is whether the plaintiff seeks damages for only economic loss." *Id.* ¶ 7.

¶ 17. In *Hamill*, we found that the homeowner was "seeking recovery for losses stemming from the failure of his expectations regarding insurance coverage," which constituted damages for economic loss generally available under contract law, but not tort law. *Id.* ¶ 9. We found no cognizable legal duty under those circumstances, concluding that public policy did not favor the creation of a separate duty on the part of independent adjusters that would subject them to common-law tort actions by insureds who have suffered economic loss as the result of allegedly mishandled claims. *Id.* ¶ 14.

¶ 18. The Association argues that *Hamill* is distinguishable. It asserts that the holding in *Hamill* is limited to the circumstances presented, namely whether an insured has a right to sue an independent claims adjuster. We reject this narrow construction. While certainly the facts differ from the instant case, *Hamill* stands for the principle that the existence of a duty is a prerequisite to recovery of economic damages in a negligence case. That critical element is lacking in the instant case, as discussed further below. While the absence of a duty is fatal to the Association's claim, we also reject the notion that the Association was denied a remedy. The Association recovered damages

for construction defects from Stratton. We find nothing unfair about the application of the economic loss rule here, and in light of our case law, we reject the Association's assertion that contractual privity must be present before the economic loss rule applies.

¶ 19. We similarly reject the Association's argument that the "professional services" exception to the economic loss doctrine applies here. Indeed, we have twice rejected the notion that contractors owed a special duty of care for purposes of this exception, separate and apart from their contractual obligations. See, e.g., *EBWS*, 2007 VT 37, ¶ 29 (rejecting argument that designing and building a creamery was a professional service akin to architecture that should fall within a professional-services exception to the economic loss rule); *Heath*, 2006 VT 125, ¶ 15 (finding claim of "contractor's negligence" in construction of a new home barred by the economic loss rule).

¶ 20. This case is very similar to *EBWS*. As indicated above, the plaintiff in *EBWS* sued the defendant for alleged defects in the construction of a creamery. The plaintiff sought solely economic damages, arguing that the defendant's work was an exception to the economic-loss rule because it was a professional service. We rejected this argument. We recounted that in a prior decision we had found it significant for purposes of the exemption that the defendants "did not hold themselves out as providers of any licensed professional services," notwithstanding the fact that the defendants "maintained complex and highly specialized responsibilities." *EBWS*, 2007 VT 37, ¶ 30 (quoting *Springfield*, 172 Vt. at 316-17, 779 A.2d at 72). Nonetheless, we clarified that "the key is not whether one is licensed in a particular field," but "rather, the determining factor is the type of relationship created between the parties." *Id.* ¶ 31. While "a license may be indicative of this relationship," we explained, "it is not determinative." *Id.*

¶ 21. We found no "special relationship" between the parties in *EBWS*. As we explained, the defendant "presented itself as a construction contractor and not as a provider of a specialized professional service," and the plaintiff "did not rely on [the defendant] to provide it with a professional service." *Id.* ¶ 32. It followed that the plaintiff "paid for the services of a contractor not a professional architect." *Id.* We thus concluded that there was no special duty of care created beyond the terms of the construc-

tion contract and that no exception to the economic loss rule applied. *Id.*; see also *Heath*, 2006 VT 25, ¶¶ 15-16 (concluding in case where plaintiffs alleged "contractor's negligence" that the "plaintiffs' remedy for the purely economic losses resulting from the reduced value or costs of repairs of the construction defects sounded in contract rather than tort," and finding "[t]he limitation to contract remedies in this context [to be] the general rule in most other jurisdictions") (citing cases upholding dismissal of negligence claims for purely economic losses resulting from alleged construction defects).

¶ 22. We reach a similar conclusion here, putting aside the question of whether privity is required before the "professional services" exception may apply. Like the defendant in *EBWS*, Engelberth presented itself as a contractor and it operated as a contractor, not as a provider of a specialized professional service. We are not persuaded that the reference to "value engineering" or the other services identified by the Association in the preconstruction agreement changes this result. Indeed, as the trial court pointed out, the actual construction agreement between Engelberth and Stratton specifically superseded the pre-construction agreement. In any event, both agreements make plain that Engelberth was hired to perform the services of a contractor, not an engineer, architect or other professional. We note that the trial court did not base its decision solely on the fact that there was an architect involved in the project, as the Association suggests. The court merely observed that both the preconstruction agreement and the later agreement referenced third-party architects/design teams that were expected to participate in the project, which reinforced its conclusion that Engelberth, in fact and by contract, functioned as a general contractor. We agree.

¶ 23. In a somewhat related vein, the Association argues that it was "foreseeable" that its members would take ownership of the project. Accordingly, they maintain, they had a special relationship with Engelberth, and Engelberth had a duty to exercise care in the provision of professional services it contracted to provide. As we have explicitly held, however, foreseeability alone is not sufficient to warrant the imposition of a professional duty. See *Hamill*, 2005 VT 133, ¶ 6; see also S. Barrett, *supra*, at 908 ("Under traditional negligence concepts, purely economic

losses are outside the scope of recovery regardless of how foreseeable those losses are."). We find no basis to distinguish this case from *EBWS*.

¶ 24. We similarly reject the Association's assertion that the economic loss rule does not apply because there was a "threat of imminent harm." Citing *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336, 341-42 (Md. 1986), the Association argues that a contractor should be liable for purely economic losses "where the defective condition complained of creates an unreasonable risk of harm to persons or property." In *Atlantis Condominium*, the Maryland court held that the defendant architects and builders had a duty "to use due care in the design, inspection, and construction of [a] condominium [which] extended to those persons foreseeably subjected to the risk of personal injury created . . . by a latent and unreasonably dangerous condition resulting from their negligence." *Id.* at 343-44. The court's holding did not encompass an imminent risk of harm to *property* only. See *id.* at 344 (stating that court was not required to, and did not, "reach the question of whether a risk of property damage alone will support the recognition of a tort duty"). The court found that there must be a risk of death or personal injury before it would allow an action to recover the reasonable cost of correcting the dangerous condition. *Id.* at 345 n.5 (stating that "conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice").

¶ 25. In *Atlantis Condominium*, the plaintiffs alleged that certain latent construction defects created a fire hazard that presented a threat to the owners' and occupants' safety and to their personal and real property. After finding that a duty existed despite the absence of privity, the court concluded that a negligence action could be maintained where only the risk of personal injury existed, but no actual physical injury had resulted. *Id.* at 344. It reasoned that a party should not have to wait to suffer actual physical injury before recovering damages for the reasonable cost of correcting the dangerous condition. *Id.* at 338, 345.

¶ 26. We find the Maryland court's approach inconsistent with basic negligence principles and our application of the economic loss rule, and we decline to follow it. We require actual injury, not simply risk of harm, before one can recover in

negligence. See, e.g., *Zukatis v. Perry*, 165 Vt. 298, 301, 682 A.2d 964, 966 (1996) ("Common law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, *actual injury* to the plaintiff, and a causal link between the breach and the injury." (emphasis added)); see also *Crowell Corp. v. Topkis Constr. Co.*, 280 A.2d 730, 731 (Del. Super. Ct. 1971) (rejecting argument that owner of building should be able to recover economic damages due to alleged negligent workmanship to cure allegedly "dangerous condition . . . before a catastrophe of some kind takes place"); W. Prosser & W. Keaton, The Law of Torts § 92, at 659 n.15 (5th ed. 1984) ("Tort liability is in general limited to situations where the conduct of the builder causes an accident out of which physical harm occurs to some person or tangible thing other than the building itself that is under construction."). To hold otherwise would vastly expand tort liability.

¶ 27. This sentiment was echoed in *Paquette v. Deere & Co.*, 168 Vt. 258, 719 A.2d 410 (1998). In *Paquette*, the owners of an allegedly defective and unsafe motor home sued the manufacturer for damages due to the reduced value of the product. Their claim rested on the doctrine of strict products liability as embodied in Restatement (Second) of Torts § 402A, which this Court has adopted. See *Paquette*, 168 Vt. at 260, 719 A.2d at 412 (citing Restatement (Second) of Torts § 402A(1) (1965) (One who sells any product in defective condition unreasonably dangerous to user or user's property is "subject to liability for *physical harm* thereby caused to the ultimate user . . . or to his property." (emphasis added))). We noted that "[s]ome jurisdictions have allowed recovery for damage to the product itself, though most often only if the loss occurred in the context of a dangerous situation such as an accident," but "[v]ery few jurisdictions . . . have allowed recovery based on claims of commercial or economic loss." *Id.* (citing authorities including 2 M. Madden, Products Liability § 22.23, at 340-41 (2d ed. 1988), which states that economic loss, including damage to product itself unaccompanied by injury to person or damage to other property, is generally not recoverable in products· liability actions).

¶ 28. While we allowed for the possibility that under certain circumstances the Court might permit recovery for damages resulting from physical harm only to the defective product itself, we found that the owners in *Paquette* were not seeking damages for any physical harm. Instead, they were seeking damages for

purely economic losses — the reduced value of the motor home resulting from its defective wiring system and related problems. Similar to the instant case, the plaintiffs argued that it was bad public policy to prohibit them from bringing their products liability claims because it would encourage people to operate dangerously defective vehicles until they suffered physical harm as the result of an accident. We found this argument unpersuasive. "If we were to allow recovery for purely economic losses in products liability actions absent any physical harm based solely on claims that an alleged defect *could have endangered* persons or their property, warranty law would, in effect, be subsumed into tort law." *Id.* at 264, 719 A.2d at 414 (emphasis added).

¶ 29. We reach an analogous conclusion here. The Association has suffered only economic harm. To allow it to recover damages for this harm based on a theory that the building defects "could have" caused an accident would subvert the actual injury requirement and provide an end run around the economic loss rule. As the *Crowell* court observed, "[t]he great weight of authority does not yet permit tort recovery . . . in the absence of physical injury to a person or dramatic incident such as accident, collapse or explosion." 280 A.2d at 732. "Though negligence may endanger the person or property of another, no actionable wrong is committed if the danger is averted." *Id.* (quotation omitted). We note, moreover, that in this case the Association did recover damages from Stratton in 2007, which allowed it to fix the defects it apparently considered most dangerous. We reject the Association's claim that it should be allowed to recover economic damages pursuant to its negligence claim.

## II. Implied Warranty Claims

¶ 30. We turn next to the Association's implied warranty claims, which rest on the construction contract between Engelberth and Stratton. As noted above, the trial court dismissed the Association's claim that Engelberth breached implied warranties of habitability and good workmanship due to the lack of contractual privity between Engelberth and the Association. On appeal, the Association asserts that these implied warranties were included as part of the contract between Engelberth and Stratton, and that it is entitled to bring this cause of action because such warranties "pass from a developer to a subsequent purchaser." The Associa-

tion cites *Meadowbrook Condominium Ass'n v. South Burlington Realty Corp.*, 152 Vt. 16, 565 A.2d 238 (1989), as support for this proposition.

¶ 31. We reject this argument. Our case law plainly contemplates the existence of contractual privity before a breach of implied warranty claim can be raised. We first recognized a cause of action for breach of an implied warranty of habitability and good workmanship in *Rothberg v. Olenik*, 128 Vt. 295, 305, 262 A.2d 461, 467 (1970). In that case, the plaintiffs had entered into a contract with the defendant for the sale of a new home, and the plaintiffs subsequently discovered structural defects in the foundation. *Id.* at 296, 262 A.2d at 462. We rejected the defendant's argument that the ancient doctrine of caveat emptor — let the buyer beware — defeated the plaintiffs' action. Instead, after reviewing numerous cases from other jurisdictions, we concluded that in cases involving the sale of a new house by a builder-vendor to a purchaser, the law would imply a warranty that the house was built in a good and workmanlike manner and was suitable for habitation. *Id.* at 305, 262 A.2d at 467; see also *Smith v. Foerster-Bolser Constr., Inc.*, 711 N.W.2d 421, 425-26 (Mich. Ct. App. 2006) (concluding that implied warranty of habitability applies *only* to new homes sold as part of a real estate transaction by builder-vendors, and that the underlying rationale for implying such warranty is to protect new home purchasers, who often do not have bargaining leverage with the builder-vendor, from the harshness of the caveat emptor rule.). It is through the act of *selling* the house that such warranties arise.

¶ 32. We reiterated this holding in *Meadowbrook*, adding that "the law will recognize an implied warranty only with respect to defects that were latent *at the time of purchase.*" 152 Vt. at 19, 565 A.2d at 241 (emphasis added). Like *Rothberg*, the plaintiff in *Meadowbrook*, a condominium association, brought suit for breach of implied warranties after discovering latent defects in its common areas. As in *Rothberg*, the builder-developer in *Meadowbrook* actually *sold* the condominium units at issue to the unit owners and it thus shared contractual privity with them. See *id.* at 18, 565 A.2d at 239. Privity was also present in *Bolkum v. Staab*, 133 Vt. 467, 470, 346 A.2d 210, 211-12 (1975), another case where the purchasers of a newly constructed house brought an action against the vendors for breach of implied warranty against structural defects.

¶ 33. The Association cites no specific language in *Meadowbrook* to show that the implied warranties of good workmanship and habitability "pass from a developer to a subsequent purchaser" in the absence of contractual privity, and we find none.[1] The existence of implied warranties in these cases, and the rationale underlying them, are founded on a sale, and there was no sale between Engelberth and the Association here. See *id.* at 470, 346 A.2d at 211 (stating that implied warranty against structural defects in sale of a newly constructed house "arises from the business of selling, rather than the business of manufacture"); see also *Kinney v. Goodyear Tire & Rubber Co.*, 134 Vt. 571, 576, 367 A.2d 677, 680 (1976) (stating that where there is no contractual relationship between the parties, claim for breach of express warranty would not lie).

¶ 34. The dissent argues that there is no logical or equitable reason to deny recovery to the Association as a subsequent purchaser notwithstanding the lack of contractual privity between Engelberth and the Association. However "logical" that concept may be, the cases cited in support involve single-family homeowners and a builder-vendor and all stress the importance of the "reasonableness" of the time from construction to discovery of latent defects and apply a statute-of-limitations overlay. Though raised in the answer to the complaint, the decision in this case neither addressed the latent nature of any defect as regards to when the Association assumed ownership, nor did it look to the statute-of-limitations defense raised below. The larger problem left unaddressed by the dissent is the economic exposure that would result from elimination of the privity requirement. The cases cited are all single plaintiff cases. Here, Engleberth Construction is already being sued by Stratton. This Court will not create an infinite implied warranty on the record in this case.

---

[1] The Association also cites a trial court order in *Smiel v. Cardinal Builders, LLC*, No. 236-5-06 Rdcv, 2008 WL 4829420 (Vt. Super. Ct. Aug. 7, 2008), as support for this proposition. The trial court ruling is not binding on this Court, but in any event, we find nothing in *Smiel* to support the Association's position. Like *Meadowbrook*, *Smiel* involved a breach of contract claim between a vendor and a purchaser. We are equally unpersuaded by *Beachwalk Villas Condominium Ass'n v. Martin*, 406 S.E.2d 372, 374 (S.C. 1991), also cited by the Association, to support its assertion that lack of privity is not fatal to a breach of implied warranty claim. This case is inconsistent with our case law concerning implied warranty claims discussed above.

¶ 35. The Association's warranty remedy lies against the entity that sold it the condominium units and implicitly warranted through the sale that the units were built in a good and workmanlike manner and that they were suitable for habitation. Its remedy does not lie against Engelberth. In reaching our conclusion, we do not find it useful to discuss provisions of the Uniform Commercial Code, cited by the Association, as we are not here dealing with the sale of moveable goods or, indeed, with any sale at all between Engelberth and the Association.[2]

*Affirmed.*

¶ 36. **Kupersmith, Supr. J., Specially Assigned,** dissenting. Oliver Wendell Holmes famously observed that it was "revolting to have no better reason for a rule of law" than its ancient lineage and worse still "if the grounds upon which it was laid down have vanished . . . and the rule simply persists from blind imitation of the past." O. Holmes, *The Path of the Law,* 10 Harv. L. Rev. 457, 469 (1897). The privity requirement to which the Court today adheres falls, in my view, in this category. Courts and commentators alike have observed that any reasons for allowing new home purchasers to recover from builder-vendors for breach of the implied warranty of workmanship while denying the same protection to a subsequent purchaser have long since vanished; adherence to the rule merely perpetuates an arbitrary distinction, promotes poor social policy, and results in economic injustice. That the subsequent purchaser here managed to obtain a partial settlement from the initial purchaser before suing the builder-vendor provides no sound basis for concluding otherwise. Accordingly, I respectfully dissent from that portion of the Court's

---

[2] We recognize that there is "an increasing trend" among state courts to recognize a cause of action by a subsequent home purchaser against a builder/vendor for breach of the implied warranties of workmanship and habitability. S. O'Brien, Note, *Caveat Venditor: A Case for Granting Subsequent Purchasers a Cause of Action Against Builder-Vendors for Latent Defects in the Home,* 20 J. Corp. L. 525, 530 (1995). Here, however, the record shows that the Association entered into a significant settlement agreement with Stratton, and we need not, therefore, consider whether the privity requirement should be abrogated in circumstances where the purchaser would otherwise lack any meaningful legal or financial recourse.

decision affirming summary judgment for Engelberth on the implied warranty claim.[3]

¶ 37. In *Rothberg v. Olenik*, 128 Vt. 295, 262 A.2d 461 (1970), the seminal Vermont decision recognizing an implied warranty against structural defects in the construction of new homes, the Court concluded that the venerable rule of caveat emptor had no place in a modern market economy.

> Conditions have radically changed since the origin of the common law rule. Homes are being constructed on a large scale by persons engaged in the building business for the purpose of selling them to individual homeowners. The ordinary purchaser is in not in a position to discover a latent defect by inspection, no matter how thoroughly his scrutiny may be, because usually he lacks sufficient familiarity with the complexities of building construction and the intricacies of applicable regulations.

*Id.* at 301, 262 A.2d at 465 (quotation omitted). Noting that this and other courts had recognized an implied warranty of merchantability in the sale of goods, and finding "no rational doctrinal basis" for differentiating between the sale of a new home and a car or other manufactured product, the Court ruled that "the law will imply a warranty against structural defects" in the sale of new homes. *Id.* at 305, 262 A.2d at 467. The vast majority of states today recognize a similar warranty of quality or workmanship. See L. Libertucci, Comment, *Builder's Liability to New and Subsequent Purchasers*, 20 Sw. U. L. Rev. 219, 223 (1991) (noting that most states "have abolished caveat emptor in favor of an implied warranty of quality for the purchaser of a new home").

---

[3] While my dissent is limited to the contract/warranty issue, I note that a number of jurisdictions have also extended a tort recovery to subsequent home purchasers on the basis that builder-vendors owe them the same duty of care as new purchasers, and that the so-called "economic loss" rule serves no sound policy purpose. See, e.g., *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862, 864 (Colo. 2005) (holding that economic loss rule did not bar negligence action by homeowners against subcontractor who owed independent duty of care); *Navajo Circle, Inc. v. Dev. Concepts Corp.*, 373 So. 2d 689, 691-92 (Fla. Dist. Ct. App. 1979) (holding that condominium association could maintain negligence action against project architect and contractor). In light of the Court's consistent adherence to the economic loss rule, however, I confine my dissent to the implied-warranty issue, which this Court has not addressed in the context of subsequent home purchasers.

¶ 38. The Association today asks the Court to extend the logic of *Rothberg* and permit subsequent purchasers of homes to recover for breach of the implied warranty of good workmanship. As noted, many courts and commentators have endorsed this additional step. See *Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 112 n.2 (Iowa 2008) (listing nineteen state court decisions allowing recovery by subsequent purchasers); see generally S. O'Brien, Note, *Caveat Venditor: A Case for Granting Subsequent Purchasers a Cause of Action Against Builder-Vendors for Latent Defects in the Home*, 20 J. Corp. L. 525, 527, 530 (1995) (observing that the "increasing trend is to recognize a cause of action for subsequent home buyers" and that predicating recovery "on whether the plaintiff was the original or subsequent purchaser . . . is unjust and illogical"); Libertucci, *supra*, at 219, 228 (noting that the "current trend" is to extend implied warranty protection to subsequent purchasers and concluding that "[p]ublic policy demands that builder-vendors be held liable to both new and subsequent purchasers for hidden defects in housing").

¶ 39. The principal doctrinal objection to affording subsequent purchasers the same protection as new-home purchasers is the lack of contractual privity. This is the ground cited by the majority here. Many courts have recognized, however, that the implied-warranty obligation is one imposed by *operation of law*, and thus contractual privity between the parties is no more essential in this context than in product liability. See *O'Brien v. Comstock Foods, Inc.*, 125 Vt. 158, 160-61, 212 A.2d 69, 70-71 (1965) (explaining that implied warranty of merchantability is "imposed by law . . . apart from considerations entirely contractual" and thus rejecting "illogic and injustice" of applying contractual privity to restrict liability). As the Iowa Supreme Court has explained, "the implied warranty of workmanlike construction is a judicial creation and does not, in itself, arise from the language of any contract between the builder-vendor and the original purchaser." *Speight*, 744 N.W.2d at 114. Thus, "there is no contractual justification for limiting recovery to the original purchaser." *Id.* The Illinois Supreme Court reached a similar conclusion, observing that, while the implied warranty "has roots" in the contract of sale, it is a "judicial innovation that has evolved" to protect home purchasers, "exists independently," and thus "[p]rivity of contract is not required." *Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 330 (Ill. 1982).

¶ 40. Viewed in this light, there is no logical or equitable reason to deny recovery to a subsequent purchaser who has no more opportunity to scrutinize the methods and standards used in constructing their home than the original buyer, and who must rely to the same extent on the knowledge and experience of the builder-vendor. Many courts have therefore concluded that the mere fortuity of an intervening owner — often, as here, for only a short time — provides no basis for denying a home buyer the protection afforded by the implied warranty of good workmanship. See, e.g., *Redarowicz*, 441 N.E.2d at 330 ("The compelling public policies underlying the implied warranty of habitability should not be frustrated because of the short intervening ownership of the first purchaser."); *Speight*, 744 N.W.2d at 114 ("[T]he public policy justifications supporting our decision to recede from the doctrine of *caveat emptor* in the sale of new homes by builder-vendors equally apply to the sale of used homes to subsequent purchasers."); *Lempke v. Dagenais*, 547 A.2d 290, 294 (N.H. 1988) ("The mitigation of *caveat emptor* should not be frustrated by the intervening ownership of the prior purchasers."); *Aronsohn v. Mandara*, 484 A.2d 675, 680 (N.J. 1984) ("The contractor should not be relieved of liability for unworkmanlike construction simply because of the fortuity that the property on which he did the construction has changed hands."); *Terlinde v. Neely*, 271 S.E.2d 768, 770 (S.C. 1980) (holding that "[t]he only logical application" of the principles underlying the implied warranty of workmanship requires a holding that it "extends to subsequent home purchasers for a reasonable amount of time"); *Sewell v. Gregory*, 371 S.E.2d 82, 85-86 (W. Va. 1988) (holding that all of the reasons for recognizing an implied warranty of workmanship in the sale of a new home "apply with equal strength to used homes"); *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo. 1979) ("[A]ny reasoning which would arbitrarily interpose a first buyer as an obstruction to someone equally as deserving of recovery is incomprehensible.").

¶ 41. A more practical objection to extending implied-warranty protection to a subsequent owner is the concern that it might expand the risks for builder-vendors beyond those for which they contracted, and ultimately increase the costs of construction. The concern, however, is unfounded. As the New Hampshire Supreme Court succinctly explained, since "[t]he builder already owes a duty to construct the home in a workmanlike manner . . .

extension to a subsequent purchaser, within a reasonable time, will not change this basic obligation." *Lempke*, 547 A.2d at 295 (quotation omitted); see also *Speight*, 744 N.W.2d at 114 ("The builder-vendor's risk is not increased by allowing subsequent purchasers to recover for the same latent defects for which an original purchaser could recover."); *Keyes v. Guy Bailey Homes, Inc.*, 439 So. 2d 670, 673 (Miss. 1983) (reasoning that builder "already owes a duty to construct the home in a workmanlike manner" so that extension of liability to subsequent home purchaser will require "no greater effort [by] . . . the builder to protect himself"); *Nichols v. R.R. Beaufort & Assocs.*, 727 A.2d 174, 180 (R.I. 1999) (concluding that "allowing subsequent owners to maintain a similar cause of action . . . will not drastically enlarge this basic obligation of the home builder"). The risk is also clearly one that builder-vendors should foresee. As the Illinois Supreme Court has observed, "[w]e are an increasingly mobile people" and a builder-vendor should therefore "know that a house he builds might be resold within a relatively short period of time and should not expect that the warranty will be limited by the number of days that the original owner chooses to hold onto the property." *Redarowicz*, 441 N.E.2d at 331.

¶ 42. Most courts, moreover, have limited a builder-vendor's exposure by requiring that claims for latent defects be brought within a reasonable period of time after completion of the construction. See, e.g., *Lempke*, 547 A.2d at 297 ("The implied warranty of workmanlike quality for latent defects is limited to a reasonable period of time."); *Nichols*, 727 A.2d at 181-82 (holding that, to avoid unlimited exposure, "we restrict the coverage of the implied warranties . . . to those latent defects that subsequent owners discover within a reasonable period of time after these home contractors have substantially completed their work"); *Terlinde*, 271 S.E.2d at 769 (stating that "[t]he length of time for latent defects to surface . . . should be controlled by the standard of reasonableness"); *Moxley*, 600 P.2d at 736 (holding that a home builder's implied warranty "extends to subsequent purchasers for a *reasonable* length of time"). The same rule applies in Vermont for initial home buyers, and would apply with equal force to subsequent purchasers. See *Heath v. Palmer*, 2006 VT 125, ¶ 7, 181 Vt. 545, 915 A.2d 1290 (mem.) (noting that "the general rule is that the duration of the implied warranty of habitability and good workmanship is determined by a standard of reasonableness" (quotation omitted)).

¶ 43. In holding that the law will imply a warranty against structural defects to protect the purchaser of a new home, this Court explained that its duty was to keep "common law principles abreast with the times" and to reject those "[a]ncient distinctions which make no sense in today's society and tend to discredit the law." *Rothberg*, 128 Vt. at 305, 262 A.2d at 467. That same duty today impels the rejection of privity as a basis for denying the equivalent protection to a subsequent purchaser of the same home.

¶ 44. Accordingly, I would reverse the summary judgment in favor of Engelberth on the implied warranty claim.

¶ 45. I am authorized to state that Justice Johnson joins this dissent.