VERMONT SUPERIOR COURT
Windsor Unit
12 The Green
Woodstock VT  05091
802-457-2121
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 21-CV-03746



Erik Edstrom and Alyson Mack
  Plaintiffs

v.

Steven Marshall,
Ira Valley Homebuilders, Inc., d/b/a Housemaster,
Vermont Concrete Cutting & Concrete, Inc.,
and Sotheby's International Realty, Inc.,
d/b/a Williamson Group Sotheby's International Realty
  Defendants

<u>Decision on Pending Motions</u>

  Plaintiffs Erik Edstrom and Alyson Mack bought a house in Stockbridge in June 2020. After closing, plaintiffs discovered water damage in the basement and sued the seller, the seller's real-estate broker, their home inspector, and a contractor who performed work on the foundation for the prior owner. Plaintiffs subsequently obtained a default judgment against the seller and settled their claims with the real-estate broker. At issue now is whether plaintiffs have shown genuine issues for trial on their remaining claims against the home inspector and the contractor who performed work for the prior owner.

  The following facts are set forth in the light most favorable to plaintiffs. In 2019, a home in Stockbridge went into foreclosure. At the time, water had infiltrated the basement, cracked the foundation walls, bowed the basement walls inward, and pooled on the basement floor. A licensed real-estate agent from Massachusetts (Steven Marshall) bought the property at a foreclosure sale and hired a contractor (Vermont Concrete Cutting) to remediate the basement. The contractor filled the foundation cracks with polyurethane, installed eight steel braces that were meant to prevent further inward bowing of the basement walls, and installed additional carbon-fiber reinforcement strips that were meant to serve the same purpose. Marshall then covered most of the interior foundation work with drywall and listed the property for sale.

  Plaintiffs had meanwhile entered the market for their first home. Plaintiffs hired a real-estate agent and inquired about the Stockbridge house. The agent conducted research and informed them that the home had recently been in foreclosure, that there had been "water damage with the foundation," and that the damage had been "addressed" but was "not 100% dry at this point." Plaintiffs then visited the home and observed some of the carbon-fiber reinforcing strips in the basement, though the other

work was concealed by drywall. Plaintiffs made an offer on the home and negotiated a price with Marshall that was substantially below the listed price.

Plaintiffs hired a home inspector (Housemaster). As part of the home-inspection contract, plaintiffs agreed that the inspection would be visual in nature, non-invasive, and non-destructive, and that the home inspection would not reveal latent conditions or concealed defects. Plaintiffs also agreed to purported limitations on the home inspector's liability. Plaintiffs did not attend the inspection on account of the onset of the pandemic, but plaintiffs thereafter received a home-inspection report that included discussion of the past water infiltration. In particular, the report included photographs evidencing past water infiltration, and the report mentioned "cracks" in the foundation and bowing of the foundation walls, which indicated that there were "hydrostatic pressures pushing the wall inward to some degree." The report also indicated that only "10% of the foundation was visible" during the inspection.

After the inspection, plaintiffs conducted additional internet research and found a prior listing of the home, which included photographs showing water damage in the basement. In particular, the photographs showed pooling water on the floor of the basement, as well as visible cracks and water infiltration through the foundation walls. In response to this, plaintiffs contacted a foundation specialist to inquire about an additional inspection. Plaintiffs also contacted their realtor to request information from the seller about the work that had been done to repair the foundation, and contacted the home inspector to request a second inspection of the foundation.

From their realtor, plaintiffs learned about the work that had been done on the property by Vermont Concrete Cutting. Plaintiffs thereafter contacted the company to ask follow-up questions, and an employee explained to them that the company had installed fiber strips and steel braces to stop the walls from moving, and had filled the cracks with polyurethane to prevent further water infiltration. Plaintiffs then visited the home with their inspector for a second time, but they were unable to enter the premises due to a problem with the lockbox. Nevertheless, plaintiffs and the inspector walked around the perimeter of the house and observed that the foundation was bowed. The inspector verbally reassured plaintiffs that they did not need to "worry about the foundation." Based upon the information received from the contractor and the home inspector, plaintiffs elected not to engage a foundation specialist for further review.

After closing on the property, plaintiffs experienced substantial water infiltration in the basement, and discovered soaked carpeting, mold, additional foundation cracks, additional foundation bowing, rot, and an infestation of carpenter ants. Plaintiffs then hired an engineer who opined that the foundation was in "very poor condition," that the cracks were structural rather than aesthetic, and that the previously-installed fiber strips and steel braces were inadequate to prevent further structural deterioration. Plaintiffs further retained an expert on home inspections, who explained that the home inspector breached the standard of care by (1) failing to identify at least one of the observed foundation cracks as a serious structural issue that required further evaluation by a qualified inspector and (2) failing to identify the extent of the inward bowing of the foundation walls as sufficiently serious to warrant further evaluation. Plaintiffs' evidence establishes that these breaches of the standard of care were proximate causes of their ensuing financial costs of repair.

As mentioned above, plaintiffs have obtained a default judgment against the seller and have resolved their claims against the real-estate agent. At issue now, centrally, is whether plaintiffs have shown a genuine issue for trial on their negligence claim against the home inspector. Stated more broadly, the question is whether a home purchaser may sue their home inspector for professional malpractice, or whether a home purchaser is limited to whatever claims they may have under the home-inspection contract.

Defendant's best arguments are that the parties entered into a contract that included allocations of economic risk (in the form of limitations on liability and provisions about the scope of the inspection), and that those allocations are part of keeping home inspections affordable. Generally, it is true that the law favors contractual agreements as the method for allocating economic risks between parties, and it is furthermore true that claims for breach of contract are the preferred method for resolving issues of liability and consequential economic damages as between contracting parties. These preferences are at the heart of what is known as the "economic loss rule," which prohibits negligence claims for financial losses brought by one contracting party against another unless the claimant shows some source of a duty of care "separate and apart" from the contract itself. *Walsh v. Cluba*, 2015 VT 2, ¶ 27, 198 Vt. 453 (quoting *Long Trail House Condominium Ass'n v. Engelberth Const., Inc.*, 2012 VT 80, ¶ 13, 192 Vt. 322). If the claimant cannot show an independent duty of care—and there is no general duty of care to avoid causing economic harm to another person, e.g., Restatement (Third) of Torts: Liability for Economic Harm § 1; *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 77 (1995)—then the negligence claim should be dismissed, and the claimant should be left with whatever contractual claims they may have. *Walsh*, 2015 VT 2, ¶¶ 27–28; *Long Trail*, 2012 VT 80, ¶ 10; *Gus' Catering, Inc. v. Menusoft Sys.*, 171 Vt. 556, 558–59 (2000) (mem.).

A number of landmarks, however, point towards a different conclusion. The first is that there are professional standards of care that apply to home inspectors. These standards are internal to the profession and are meant to establish minimum requirements. Although the authorities are not unanimous, there are a number of cases holding that these professional standards create duties that are owed by home inspectors to their clients, and that these duties exist "separate and apart" from the home-inspection contract. See, e.g., *Moreno v. Sanchez*, 131 Cal.Rptr.2d 684, 698–99 (Cal. Ct. App. 2003); *Moransais v. Heathman*, 744 So.2d 973, 979–84 (Fla. 1999); *Lucier v. Williams*, 841 A.2d 907, 912 (N.J. App. Div. 2004); accord, e.g., *Dori v. Rabco Engineering, P.C.*, 2011 WL 5222832 at *2 (N.Y. Sup. Ct. Nov. 1, 2011); *Semirale v. Jamieson*, 2008 WL 698452 (Ohio Ct. App. Mar. 13, 2008); but see, e.g., *Donnelly v. Fannie Mae*, 2015 WL 6739163 (Del. Ct. Common Pleas Nov. 3, 2015).

A second landmark is that existing cases have disapproved of contractual provisions that purport to limit the liability of home inspectors. In particular, the Vermont Supreme Court has expressed that such provisions are "unconscionable" because they might encourage home inspectors to disregard their professional standards of care and instead act in a reckless manner—to "walk through the house in five minutes, fabricate a report, and escape liability, without any consideration of the consequences of their conduct on the homebuyer's decision involving hundreds of thousands of dollars." *Glassford v. BrickKicker*, 2011 VT 118, ¶ 22, 191 Vt. 1 (internal quotations omitted). Another way of expressing the same conclusion is to say that home inspectors are not free to write their home-inspection contracts in a way that relieves them of their obligation to follow professional standards of care (or in a way that relieves them of the consequences of their failures to follow professional standards of care). It is the same as saying that lawyers are not free to write their retainer agreements in

a way that limits their liability to the fees paid by the client, or that doctors are not free to accept patients for treatment only if the patient agrees to limit the doctor's liability to the cost of the medical procedure. It may be true that such provisions would lower the cost of professional services to consumers, but in these "professional services" contexts, public policy is better served by insisting that professional-conduct standards cannot be bargained away. In other words, in these situations, contractual claims are not adequate for public protection, and independent tort claims for malpractice are seen as a necessary mechanism for upholding and preserving the professional standards of care. Restatement (Third) of Torts: Liability for Economic Harm § 4 cmts. a–b.

A third landmark is that the entire purpose of the home inspection "is to give a consumer a rational basis upon which to decline to enter into a contract to buy, to provide lawful grounds to be relieved from a contractual commitment to buy, or to offer a sound basis upon which to negotiate a lower price." *Glassford*, 2011 VT 118, ¶ 22 (internal quotation omitted). Put another way, home inspectors receive money from customers in exchange for their professional advice about a major financial decision. It makes sense, then, to recognize that home inspectors have a duty of care to avoid causing financial harm to their clients.

A final landmark is that home inspectors are licensed by the state, for all of these reasons. See, e.g., 26 V.S.A. §§ 1051–1095.

Each of these landmarks are relevant to the applicability of the "professional services" exception to the "economic loss rule." As outlined in Restatement (Third) of Torts: Liability for Economic Harm § 4, the "professional services" exception allows malpractice claims against professionals to proceed even when those claims seek only economic damages. The idea is that professionals owe their clients a duty of care with respect to the financial advice they provide, and that the duty of care should be enforceable through professional-negligence actions when the professional advice involves complex discretionary judgments, made according to professional standards of care by trained and licensed professionals. Restatement (Third) of Torts: Liability for Economic Harm § 4 cmts. a–b.

In the court's view, the aforementioned observations support the conclusion that home inspections fall within the "professional services" exception to the "economic loss rule." For this reason—and because plaintiffs' expert has testified to the effect that the home inspector in this case failed to meet the minimum professional standard of care, and that the home inspector's negligence was a proximate cause of plaintiffs' economic damages, e.g., *Bull v. Pinkham Engineering Assocs., Inc.*, 170 Vt. 450, 457–58 (2000); *Estate of Fleming v. Nicholson*, 168 Vt. 495, 497 (1998)—the court concludes that plaintiffs may pursue their claim for negligence against the home inspector, and that plaintiffs have shown a genuine issue for trial.

Having made this ruling, there is little to distinguish the malpractice claim against the home inspector from the related claims for breach of contract, breach of the covenant of good faith and fair dealing, and breach of warranty. Both sets of claims appear to involve the same matrix of facts, and the parties have not meaningfully discussed whatever similarities and differences may exist. *Bloomer v. Gibson*, 2006 VT 104, ¶ 19, 180 Vt. 397; *Lefebvre v. Cawley*, No. 2009-194, 2010 WL 286731 (Vt. Jan. 2010) (unpub. mem.). At the moment, given that the court is allowing the malpractice claim to proceed, there is little imperative to resolving the issue. At trial, however, the court will not be inclined

to instruct the jury on the contractual claims unless a clear basis for differentiation appears from the evidence. *Lefebvre*, 2010 WL 286731 at *2.

A second major issue remaining in the litigation is whether plaintiffs have shown a genuine issue for trial regarding their claims for consumer fraud, common-law fraud, and negligent misrepresentation against the home inspector and the contractor. Here, even viewed in the light most favorable to plaintiffs, the evidence shows that plaintiffs knew from their home inspector that there had been past water infiltration in the basement, that there were cracks in the foundation, and that the foundation walls were bowed. Plaintiffs also gathered additional information about the same problems from other sources (including from their realtor and from their own research). Plaintiffs also knew from the contractor about the repairs that had been attempted. As such, the evidence establishes that plaintiffs had independent knowledge of the defects at the property. *PH West Dover Property, LLC v. Lalancette Engineers*, 2015 VT 48, ¶¶ 17–20, 199 Vt. 1; *Silva v. Stevens*, 156 Vt. 94, 108–09 (1991); *Sugarline Associates v. Alpen Associates*, 155 Vt. 437, 444–45 (1990); Restatement (Third) of Torts: Liability for Economic Harm § 11. Likewise, the evidence does not show that the remaining defendants concealed facts from plaintiffs, but rather that they provided plaintiffs with negligent opinions about the extent of the damage, the need for further inspections, and/or the efficacy of the attempted repairs. *Lalancette Engineers*, 2015 VT 48, ¶ 12; *Webb v. Leclair*, 2007 VT 65, ¶¶ 21–25, 182 Vt. 559; *Heath v. Palmer*, 2006 VT 125, ¶ 14, 181 Vt. 545 (mem.); *Winton v. Johnson & Dix Fuel Corp.*, 147 Vt. 236, 240 (1986); Restatement (Third) of Torts: Liability for Economic Harm § 14. For these reasons, plaintiffs have not shown a genuine issue for trial on their claims for consumer fraud, common-law fraud, and negligent misrepresentation.[*] To the extent that professional opinions are sometimes actionable as fraud, e.g., *Mansfield v. Heilmann, Ekman, Cooley & Gagnon, Inc.*, 2023 VT 47, ¶ 36; *Webb*, 2007 VT 65, ¶ 24; *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 133 (1993), the circumstances under which that rule applies are not present here.

A third issue is whether plaintiffs have shown a genuine issue for trial regarding their claim against the contractor for negligence. Here, the issue is quite different than the above discussion regarding the home inspector, because the professional-services exception does not apply to "construction contractors and tradesmen." Restatement (Third) of Torts: Liability for Economic Harm § 4 cmt. b. Instead, in the context of construction contracts, the view is that the risk of consequential

---

[*] An additional argument made by defendants related to whether the real-estate transaction occurred "in commerce" within the meaning of the Vermont Consumer Protection Act, as an extension of the reasoning in *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 21, 195 Vt. 524, and *Kelton v. Criterium Lalancette Engineers*, No. 469-8-18 Rdcv, 2019 WL 13172492 at *2 (Vt. Super. Ct. Jan. 7, 2019) (Hoar, J.). It seems evident to the court that real-estate transactions occur within the context of an interstate consumer marketplace, e.g., *Masseau v. Luck*, 2021 VT 9, ¶ 18, 214 Vt. 196, that the CPA prohibition against unfair or deceptive acts in commerce is "applicable to real estate transactions," 9 V.S.A. § 2453(e), and that, at a minimum, these rules apply to professionals who are operating in this consumer marketplace, e.g., *Lalancette Engineers*, 2015 VT 48, ¶ 10; *Vastano v. Killington Valley Real Estate*, 2007 VT 33, ¶ 9, 182 Vt. 550 (mem.); *Carter v. Gugliuzzi*, 168 Vt. 48, 56 (1998), regardless of whether the same conclusion would also apply to the individual person selling their home, e.g., *Kelton*, No. 469-8-18 Rdcv. It furthermore seems evident that the applicability of the CPA turns not upon questions of contractual privity but rather upon the question of whether the defendant was a "violator" of the CPA within the meaning of such cases as *Glassford v. Dufresne & Associates, P.C.*, 2015 VT 77, ¶¶ 31–37, 199 Vt. 422, *Knutsen v. Dion*, 2013 VT 106, ¶ 19, 195 Vt. 512, and *State v. Stedman*, 149 Vt. 594, 598 (1988), which was not a question meaningfully argued by the parties. Defendants did not meet their burden of showing entitlement to summary judgment on either ground, but the court nevertheless grants summary judgment on the consumer-fraud claims for the two separate and independent reasons set forth herein.

economic losses arising from negligent workmanship should be allocated by the construction contract, rather than through the independent administration of negligence law. *Walsh*, 2015 VT 2, ¶ 27; *Long Trail*, 2012 VT 80, ¶ 10; *Heath v. Palmer*, 2006 VT 125, ¶ 15, 181 Vt. 545 (mem.); *Philadelphia Indemnity Ins. Co. v. Life Safety Fire Protection, Inc.*, 2024 WL 3849973 at *6 (D. Vt. Aug. 16, 2024); *Country Mutual Ins. Co. v. Altisource Online Auction, Inc.*, 2020 WL 4275660 at *3 (D. Vt. July 24, 2020). In other words, in construction contracts, the general "economic loss rule" applies.

A separate exception to the "economic loss rule" arises when a contractor's defective workmanship damages other property "in which the [plaintiff] has no proprietary interest." Restatement (Third) of Torts: Liability for Economic Harm § 7; *Walsh*, 2015 VT 2, ¶ 28. Although this exception makes sense (because it addresses the situations where a contractor's defective workmanship harms others who were not part of the contractual arrangements), the exception does not apply in this case because the damage allegedly caused by the defective workmanship did not extend to someone else's property, but rather was limited to plaintiffs' own house. And even then, the evidence is not that the defective work caused new and unexpected harms to property outside the scope of the contract, e.g., *Cincinnati Ins. Co. v. Southern Vermont Sprinkler Services, Inc.*, 2019 WL 5698930 at *3–4 (D. Vt. July 10, 2019); *Moffitt v. Icynene, Inc.*, 407 F.Supp.2d 591, 600–01 (D. Vt. 2005), but rather that the work performed under the contract was inadequate to solve the existing water problems. The ensuing damages were within the contemplation of the contracting parties, and the construction contract was adequate to anticipate and cover these risks. *Walsh*, 2015 VT 2, ¶ 28; *Altisource Online Auction*, 2020 WL 4275660 at *3.

Finally, plaintiffs have moved to amend their complaint against the contractor to allege a claim for breach of warranty. Plaintiffs allege that, during a recent deposition, they discovered that the contractor gave the prior owner several transferable warranties, including one that, in pertinent part, promised that the steel braces would "stop inward horizontal movement of the wall(s) prepared" for a period of "25 years from the date of installation." Plaintiffs seek enforcement through a claim for breach of the warranty. The contractor argues that the amendment should be denied as futile, because plaintiffs have not shown evidence that they negotiated a transfer of the warranty with the prior owner, nor that they made a claim under the warranty that was denied. In other words, the contractor contends that plaintiffs will not succeed at trial on their proposed claim. A motion to amend, however, does not invite the court to "resolv[e] a contest between the parties about the facts or the substantive merits of the plaintiff's case." 5B Wright & Miller, Federal Practice and Procedure: Civil 3d § 1356. A motion to amend instead asks whether the proposed amendment provides fair notice of the claim, whether the proposed amendment would provide the maximum opportunity for each claim to be decided on their merits, and whether the proposed amendment fairly enables the parties to assert matters that were unknown at earlier stages of the proceedings. *Prive v. Vermont Asbestos Group*, 2010 VT 2, ¶ 12, 187 Vt. 280; *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 4, 184 Vt. 1. Here, because each of those questions are answered in the affirmative, the applicable policies favor allowing the amendment proposed by plaintiffs.

## ORDERS

1. Defendant Vermont Concrete Cutting's Motion for Summary Judgment (Motion #5), filed December 19, 2023, is granted.

2. Defendant Williamson Group Sotheby's International Realty's Motion for Summary Judgment (Motion #6), filed January 5, 2024, is moot.

3. Defendant IRA Valley Builders, Inc.'s Motion for Summary Judgment (Motion #10), filed January 31, 2024, is granted in part and denied in part.

4. The duplicative motions filed as Motions #8 and #9 are moot.

5. Plaintiffs' Second Motion to Amend Complaint (Motion #13), filed February 23, 2024, is granted.

6. The following schedule is established for discovery on the breach-of-warranty claim against defendant Vermont Concrete Cutting. Any written discovery must be sent within 30 days of the file-stamped date of this order, with any responses due within the time permitted by rule, and any depositions must be completed within 75 days of the file-stamped date of this order. Any dispositive motions on the breach-of-warranty claim are due within 90 days of the file-stamped date of this order, with any responses due within the time permitted by rule.

7. A pretrial conference will be scheduled after 90 days or upon resolution of any dispositive motion filed pursuant to the preceding paragraph. Any proposed amendments to the schedule require a written motion.

Electronically signed on Friday, September 13, 2024 pursuant to V.R.E.F. 9(d).

H. Dickson Corbett
Superior Court Judge

Vermont Superior Court
Filed 09/13/24
Windsor Unit