Walker Motors, Inc. et. al. v. City of Montpelier et. al., No. 921-12-10 Wncv (Toor, J., Dec. 30, 2013).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
WASHINGTON UNIT
CIVIL DIVISION

| | |
|---|---|
| WALKER MOTORS, INC. and SIERRA HOLDINGS, LLC, <br>   Plaintiffs <br><br> v. <br><br><br> CITY OF MONTPELIER, VT and J.A.MCDONALD, INC., <br>   Defendants | Docket No. 921-12-10 Wncv |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTION TO STRIKE, AND MOTIONS TO INTERVENE

Plaintiffs in this case are a business and a landowner that each seek damages from the City and a road contractor for financial losses allegedly incurred during a road project involving construction of a roundabout on Routes 2 and 302. The complaint asserts three causes of action: a claim for an unconstitutional taking due to blocked access to Walker Motors, a claim that the management of traffic flow and work hours was done in a negligent manner, and a claim that Plaintiffs were third-party beneficiaries of a contract between Defendants, the terms of which (regarding traffic management) were breached. The parties have filed cross-motions for summary judgment.[1] In addition, the Defendants' insurers have filed motions to intervene.

---

[1] The court is aware that the motions were ripe in July. However, perhaps as a result of some confusion due the amended discovery schedule that was filed in the midst of the summary judgment filings, the case was not brought to a judge for consideration until November. The court apologizes for the delay.

## Relevant Undisputed Facts

The basic facts here are undisputed. In 2008 the City and McDonald entered into an agreement by which the latter would perform construction on a roundabout at Routes 2 and 302 in Montpelier. The agreement incorporated Agency of Transportation requirements, including one that traffic not be delayed for more than ten minutes during road projects.

Walker Motors operated the Walker Ford dealership at 265 River Street in Montpelier until late 2009. Sierra is the LLC (of which Walker Motors' president is the CEO) that owns the real estate at that location. Drawings incorporated by reference in the contract include one stating that "reasonable access to driveways and to Walker Motors shall be maintained at all times." In May of 2009, MacDonald was told by the City to have a flagger posted at Walker Motors to keep the entrance open. This was not always done. Obstruction of the entrance to Walker Motors was a "chronic problem" during the construction.

## Other Relevant Allegations

Although neither party has submitted these facts in connection with the summary judgment motions, there are some other allegations in the complaint that help to clarify what this case is about. Plaintiffs allege that during the construction project "massive traffic jams occurred almost daily" on River Street and that "[i]ngress and egress to River Street commercial enterprises routinely was blocked for extended time periods." Complaint ¶ 19. They further allege that on "many occasions . . . *all* entrances to Walker Ford were blocked, *preventing ingress or egress to the dealership during normal business hours*." Id. ¶ 20 (emphasis added). The complaint alleges that even employees were at times unable to get to work at Walker Motors because all entrances were blocked. Id. ¶ 26. Plaintiffs allege that the dealership suffered disastrous consequences due to the loss of business resulting from the blocked access.

Specifically, they allege that Walker lost 39% of its business due to the traffic problems, that the value of the real estate dropped by over a million dollars, and that they eventually sold the car business, leased the real estate to another dealer, and lost future profits as a result. Id. ¶¶ 31-42.[2]

## Defendants' Motion for Summary Judgment

Defendants Walker Motors and Sierra present several arguments in support of their motion. They argue that the claim for a taking (Count 1) must fail because any impact upon Defendants was temporary; that the negligence claim (Count 2) must fail due to the economic loss rule; and that the breach of contract claim (Count 3) must fail because Plaintiffs were not third-party beneficiaries of the contract and thus lack standing.[3]

## Count 1: The Takings Claim

Plaintiffs' first claim is that by barring access to their property for stretches of time during the construction project the City and McDonald engaged in an unconstitutional taking of their property. Defendants argue that a temporary interference with access to property as the result of public road work cannot as a matter of law be a taking.

As on many topics, Vermont case law is sparse on this issue. There is clear authority for the proposition that a town's winter closing of the road that provides the only access to someone's land can be a taking for which the landowner must be compensated. Okemo Mountain, Inc. v. Town of Ludlow, 171 Vt. 201 (2000). Plaintiffs argue that Okemo resolves this case, because blocking access to one's property is a taking. However, that case involved the total closing of a road for an extended period each year, not the sort of intermittent blockage of access

---

[2] Plaintiffs assert numerous other details in their amended statement of material facts, but not all are material to the court's ruling today.

[3] In their response to the Defendants' summary judgment motion, Plaintiffs ask in the alternative for more time for discovery before the court rules. Plaintiffs' Opposition at 19-20. However, they have not complied with the requisite procedures for making such a request, which include an affidavit explaining why they "cannot present facts essential to justify [their] opposition." V.R.C.P. 56(d). The court therefore denies that request.

at issue here. While both denials of access are temporary in one sense, the Okemo case involved permanent winter blockage. However, the case does acknowledge a landowner's right of access to an abutting public road, and that even a less-than-total denial of that access can be a taking. Id. at 211 ("the Department's prohibition of the use of the road in the winter represents a taking of Lysobey's property right of access").

There is also an old case discussing the impact of a public bridge repair project upon an adjoining dam owner. Town of East Montpelier v. Wheelock, 70 Vt. 391 (1898). Defendants argue that Wheelock says a temporary public works project cannot be a taking. It does have language suggesting that a temporary impact upon a business due to a public project is not a taking. However, it involved not a business adjoining a road but a business that was damming a public waterway for business purposes. Id. at 396 ("The complainant did not take the defendants' property; it only temporarily prevented the defendants from obstructing the natural flow of the river at a point where the State had an easement to repair a bridge for the safe passage of the public, and rendered the defendants' mill less profitable for such time as the master has found was reasonable for making the repairs."). Thus, the Court noted that the interruption of business was "a risk and burden assumed by the defendants in maintaining a dam across the river for private purposes." Id.

Wheelock also seems to conclude, however, that this is true only if the public work is done in a reasonable manner: the town "had a right to have the water drawn as low as was necessary for the convenient prosecution of the work, and hence, it is not liable for damages occasioned thereby; but if it went beyond its right and thereby damaged the defendants, it is liable." Id. at 398-99. Moreover, the case appears outdated, as it also cites with approval another

4

case stating that appropriating private land to create a road is not a taking, which is certainly no longer the law.

Neither of these cases addressed the precise issue on the table here: whether temporary lack of access to a business as a result of a public road project can be a taking. The issue of lost business as a result of various road projects has, however, been litigated in many other jurisdictions, with varying results. *See, e.g.*, Kurt H. Garber, <u>Eminent Domain: When Does a Temporary Denial of Access Become a Compensable Taking?</u>, 25 U. Memphis L. Rev. 271, 277 (Fall 1994)("States have adopted different standards for determining whether a temporary deprivation constitutes a taking.").

First of all, it is generally accepted that one of the rights of a property owner is a right of access from abutting roads. <u>Okemo</u> says as much. 171 Vt. at 207, 211. The right of access "includes not merely the ability of the abutting landowner to enter and leave his premises by way of the street or highway, but also the right to have the premises accessible to patrons, clients and customers." <u>City of Beaumont v. Marks</u>, 443 S.W. 2d 253, 255-56 (Tex. 1969), citing, inter alia, 10 McQuillin, <u>Municipal Corporations</u> § 671 (3d ed. 1950). "It is well settled that 'the right of ingress and egress is a property right which cannot be taken without compensation.'" <u>State of Indiana v. Dunn</u>, 888 N.E. 2d 858, 862 (Ind. App. 2008)(citation omitted). "It is well-established that the owner of land adjoining a road or highway has a property right in the nature of an easement to access. This easement of access entitles the owner to go back and forth between his own land and the abutting public road without unreasonable interference." Mark S. Dennison, <u>Recovery of Damages for Temporary Conditions Ensuing from Construction or Repair of Public Improvement</u>, 51 Am. Jur. Proof of Facts 3d 489, § 18 (Westlaw through Dec. 2013).

5

It also seems to be generally accepted that the inconvenience and reduction in traffic flow to a business occasioned by things such as addition of medians and changing of road design are not compensable takings. *See, e.g.*, Palm Beach County v. Tessler, 538 So. 2d 846, 849 (Fla. 1989) ("A taking has not occurred when governmental action causes the flow of traffic on an abutting road to be diminished."); State v. Dunn, 888 N.E. 2d 858, 869 (Ind. App. 2008) ("landowners have no property right to the free flow of traffic past their properties."); State, Idaho Transp. Bd. v. HI Boise, LLC, 282 P.3d 595, 599-600 (Idaho 2012) ("state action that merely results in a change in traffic flow requiring traffic to reach property by a more circuitous route does not amount to a taking as a matter of law."); State ex rel. BDFM Co. v. Ohio Dept. of Transp., No. 11AP–1094, 2013 WL 209132, ¶ 27 (Ohio App. Jan.17, 2013)("any change in traffic flow occasioned by placing a median in the road results from the exercise of the police power of the state" and is non-compensable); Dennis, Recovery of Damages, § 18 ("A landowner's right of access is, however, subject to reasonable restrictions under the government's police power to protect the public welfare and regulate traffic."); 26 Am. Jur. 2d Eminent Domain § 197 (Westlaw through Nov. 2013) ("The mere rerouting or diversion of traffic, although it results in diminishing the value of the adjacent property, is not a taking or damaging of private property within the constitutional provision requiring compensation therefor").

The question here, however, is a different one: can a government entity entirely block access to a business from the road during construction, and if so, for how long? *See, e.g.*, id. (diversion of traffic "is to be distinguished from a rerouting of a highway *which impairs the adjacent owner's right of access*.")(emphasis added). Although the cases are certainly not all

6

consistent in other jurisdictions,[4] there are some doctrines that appear repeatedly. One is

described in Nichols on Eminent Domain:

> When a street is so obstructed during the construction of a public work that access to abutting property is wholly cut off, the fact that the injury is only temporary is generally held to be no reason for denying the owner compensation. However, when access, though rendered difficult and inconvenient, is not wholly cut off, the owner is denied compensation. . . .
>
> However, if the temporary obstruction is a result of unreasonable, unnecessary, arbitrary or capricious acts or conduct by the one in charge of the improvement or construction, the abutting landowner has a right of action for damages resulting from such interference with access to his property.

2A Nichols on Eminent Domain § 6.4442(2), quoted in Filler v. City of Minot, 281 N.W. 2d 237,

244 (N.D. 1979). This is consistent with the analysis of a lengthy article on the subject:

> In inverse condemnation actions—where the landowner alleges a taking of property without formal condemnation by eminent domain—the general rule followed in most jurisdictions is that temporary conditions incident to the construction or repair of a public improvement can only give rise to a claim of consequential damages if the landowner offers proof that the construction or repair was performed negligently, was unlawful, or was unreasonably prolonged.

Dennison, Recovery of Damages, *supra*, § 13. The rationale is this:

> The inconvenience and damage which a property owner suffers from these temporary obstructions are incident to city life and must be endured. The law gives him no right to relief, recognizing that he recoups his damage in the benefit which he shares with the general public in the ultimate improvement which is being made. The law, however, does afford him a relief, if the city or a contractor interferes with the highway without authority; or, if acting legally, prolongs the work unnecessarily or unreasonably. The obstruction of streets and highways, or the work carried on in them of a public nature, must be reasonable and necessary for the public improvement which is being made.

---

[4] One judge has noted that "the changing concepts of 'taking' and 'property,' and 'police-power' versus "eminent-domain' have resulted in 'a jumble of doctrines, lack of uniformity of decisions, and . . . dissimilar treatment of landowners who have suffered similar kinds of harm.'" Constance v. State Through Dept. of Transp. and Development Office of Highways, 626 So.2d 1151, 1159 (La. 1993)(Dennis, J. concurring)(citation omitted).

Farrell v. Rose, 170 N.E. 498, 499 (N.Y. 1930). Under such an approach, the question is whether the government (and, as here, its agent) has acted unreasonably. "So long as the work is lawful, and is pursued with reasonable diligence, liability for damages to those whose access is temporarily restricted does not attach." Lewis v. Globe Const. Co., Inc., 630 P.2d 179, 184 (Kan. App. 1981). "If the temporary obstruction is a result of unreasonable, unnecessary, arbitrary or capricious acts or conduct," then "the abutting landowner has a right of action for damages resulting from such interference with access to his property." Hadfield v. State of Idaho ex rel. Burns, 388 P. 2d 1018, 1022 (Idaho 1964).

Another approach used by some courts is to ask not about the nature of the government action, but about the nature of the impact upon the landowner. In these jurisdictions, the question is whether the interference with the landowner's access was "substantial." *See, e.g*., Eminent Domain, *supra*, 25 U. Memphis L. Rev. at 279-80 (discussing Georgia and North Dakota cases). One example is a case similar to this one, where a 27-month road project was found to have blocked access to a truck dealership, leading the dealership to close. Newman v. Comm. of Pennsylvania, Dept. of Transportation, 791 A. 2d 1287  (Pa. Commw. Ct. 2002). The court rejected the  argument that because the blocking of access was temporary, it was not a taking. The court held that the issue was whether the dealership "established a *substantial deprivation* of the use and enjoyment of" the property as a result of the lack of access. Id. at 1290 (emphasis added). *See also*, Maloley v. City of Lexington, 536 N.W. 2d 916, 921 (Neb. App. 1995)(property owner entitled to present evidence as to whether his "right of access has been destroyed or substantially impaired" due to temporary lack of access from road during jail construction project). `

8

Given all of the cases addressing temporary access issues, the court rejects Defendants' argument that there is a bright line rule that a temporary denial of access is not a taking. *Accord*, First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal., 482 U.S. 304, 319 (1987)(temporary takings which "deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation."). Nor, however, is there a bright-line rule that denial of access is automatically a taking. Instead, it is a case-by-case issue dependent upon the level of impact to the business and the reasonableness of the government action. *See, e.g*., Dennis, Recovery of Damages, § 18 ("A case-by-case approach is generally employed to determine whether the facts and circumstances show reasonable access or substantial interference with access. Only when the landowner's evidence establishes that the temporary restriction on access meets the court's standard of unreasonableness can it rise to the level of a compensable taking."); State of Florida Dept. of Transp. v. Rubano, 636 So.2d 749, 752 (Fla. App. 4 Dist. 1994)("While we realize that a loss of access does not have to be permanent in order to be compensable, we believe the duration of the loss is still one fact to be considered."), *aff'd*, 656 So. 2d. 1264 (Fla. 1995).

At this stage of the case, the court need not decide precisely which analysis the Vermont Supreme Court is most likely to adopt in determining when a temporary denial of access to a property is a taking.[5] Suffice it to say if Plaintiffs prove the facts alleged here, they could potentially establish both a substantial impact upon their property rights and unreasonable or negligent action by the Defendants. Thus, summary judgment for Defendants is not appropriate.

---

[5] Nor does the court at this stage decide what kinds of damages Plaintiffs may be entitled to, as that issue is not necessary to the court's decision today.

<u>Count 2: The Negligence Claim</u>

In Count 2, Plaintiffs assert that they were injured financially as the result of negligence by Defendants in managing the traffic flow and hours of construction. Plaintiffs cite cases for the unremarkable proposition that a lack of reasonable care in doing road projects can constitute negligence, a proposition with which the court has no quarrel. The fact that it can be negligence, however, does not resolve the question before the court. There is negligence leading to physical injury to people or property, and there is negligence leading to financial harm. When only the latter is alleged, the economic loss rule comes into play.

The general idea of the economic loss rule is that it "prohibits recovery in tort for purely economic losses." <u>EBWS, LLC v. Britly Corp.</u>, 2007 VT 37, ¶ 30, 181 Vt. 513. "It is well established in Vermont that absent some accompanying physical harm, there is no duty to exercise reasonable care to protect another's economic interests." <u>Wentworth v. Crawford & Co.</u>, 174 Vt. 118, 126 (2002). "Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm, which does not include economic loss." <u>Gus' Catering, Inc. v. Menusoft Sys.</u>, 171 Vt. 556, 558 (2000) (mem.).

Plaintiffs argue that because they were allegedly third-party beneficiaries of the contract between the Defendants, they qualify for an exception to the doctrine. A professional services relationship can create an exception. "Purely economic losses may be recoverable in professional services cases because the parties have a special relationship, which creates a duty of care independent of contract obligations." <u>EBWS</u>, 2007 VT 37, ¶ 31; *see also*, <u>Sharon Academy v. Wieczorek Insurance, Inc.</u>, No. 442-7-13 Wncv (Toor, J.), 2013 WL 6631043 (Vt. Super. Nov. 13, 2013). However, "[t]o fit within this exception, the parties must have 'a special relationship,

which creates a duty of care independent of contract obligations.'" Long Trail House Condo. Ass'n v. Engelberth Const., Inc., 2012 VT 80, ¶ 13, 192 Vt. 322, quoting EBWS at ¶ 31. A contractor on a construction project is not considered to be providing a  professional service that creates a special relationship. EBWS, 2007 VT 37, ¶ 32. Nor is there anything to suggest that the City's role here meets that definition. Thus, this exception does not apply.

Plaintiffs argue in the alternative that because there was no contract here, the economic loss doctrine does not apply at all. Although many of the cases do discuss the distinction between tort recovery and contract recovery, none of the cases Plaintiffs cite state that the doctrine is inapplicable in the absence of a contract. To the contrary, the Vermont Supreme Court has expressly applied the doctrine where there was no contract between the parties. Long Trail, 2012 VT 80, ¶¶ 14-15 (noting that the Court had "applied the economic loss rule in the absence of contractual privity" and pointing to two prior cases in which "there was no contractual relationship between the parties"); Wentworth, 174 Vt. at 126 (applying the doctrine despite noting that there were no facts "supporting the existence of a contractual duty").

For the foregoing reasons, the court concludes that Count 2 is barred by the economic loss doctrine.

Count 3: The Contract Claim

Plaintiffs' final claim is that they are third-party beneficiaries of the contract between the City and McDonald, entitled to assert a claim for its breach. They rely for this claim upon a drawing incorporated by reference in the contract. The notes to the drawing, which require a magnifying glass to read,  state in relevant part: "Reasonable access to driveways and to Walker Motors shall be maintained at all times." Defendants do not dispute that this was a term of the contract. On this basis, Plaintiffs argue that they were third-party beneficiaries of the contract,

11

and that the alleged failure to provide reasonable access to their business constitutes a breach of contract which they can enforce.

Preliminarily, even if the argument is correct, it applies only to Walker Motors, not to Sierra Holdings. The document referenced only Walker Motors, and no evidence at all suggests that the contract was intended to benefit Walker's landlord. Thus, summary judgment will be granted for Defendants on Sierra's claim.

To enforce the contract, Walker must prove that it was a third-party beneficiary rather than an incidental beneficiary. McMurphy v. State, 171 Vt. 9, 16 (2000). This depends upon the intent of the contracting parties. Id. The issue in McMurphy was whether a contract between a town and the State to maintain an intersection, which stated that this was in "the public interest," was intended to confer third-party beneficiary status on those members of the public using the intersection. The court held that it was not, noting: "Obviously, the public benefits from properly maintained highways; however, the most effective, convenient, and economical method of doing so is not for their direct benefit, but for their incidental benefit." Id. at 17. "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Restatement (Second) Contracts § 313, Government Contracts, cmt. a (Westlaw through Oct. 2013).

Here, however, the contract – in what seems a rather unusual provision for a government contract – *expressly mentions* Walker Motors, requiring that reasonable access to its business was to be "maintained at all times." This arguably shows a direct statement of intent to benefit Walker. *See*, Legare v. Music & Worth Const., Inc., 486 So.2d 1359, 1362 (Fla. App. 1986)(contract requiring contractor to "refrain from isolating places of business [along Centerville Road] and [provide] access to all places of business whenever construction interfered

12

with existing means of access" might establish third-party beneficiary status). However, the "'clear intent' hurdle is a high one. It is not satisfied [merely] by . . . explicit reference to a third party, or even a showing that the contract operates to the [third parties'] benefit and was entered into with [them] in mind." GECCMC 2005-C1 Plummer Street Office Limited Partnership v. JPMorgan Chase Bank, N.A., 671 F. 3d 1027, 1033 (9th Cir. 2012)(internal citations and quotations omitted).

An interesting case both for its similarities to, and its differences from, this one is Lewis v. Globe Const. Co., Inc., 630 P.2d 179 (Kan. App. 1981). There, as here, a business affected by road construction argued that it was a third-party beneficiary of contract language concerning traffic flow. The language at issue stated that the contractor was to sequence the work so as to "maintain local traffic to the businesses between" two roads. Id. at 181. Unlike this case, the contract did not expressly mention any particular business. Also unlike this case, the contract expressly stated that "it is not intended by any of the provisions of any part of the Contract to create the public or any member thereof a third party beneficiary hereunder, or to authorize any one not a party to this Contract to maintain a suit . . . pursuant to the terms or provisions of this Contract." Id. at 185. The court cited with approval another case holding that "[a]bsent a manifested intent to the contrary construction contracts between a contractor and a state or other public body for highway repair or construction of a new highway are generally not considered as being for the benefit of third persons…" and concluded that the benefit to the businesses along the road was merely incidental. Id. at 185. It noted that "the parties to the contract made it abundantly and expressly clear that they did not intend to create contractual rights in third parties." Id.

13

Here, Defendants have not pointed to any express contract language excluding the possibility of third-party beneficiaries, and the express naming of Walker is striking. Defendants argue that the provision in this case shows nothing more than an intent to keep traffic flowing past Walker Motors, but cite nothing concrete to support that. On the other hand, neither party offers any evidence as to what led to the insertion of Walker's name in the contract documents, and the court at this point can only speculate. Nor have the parties fully addressed whether allowing Walker a right of action would or would not be consistent with other terms of the contract or the "policy of the law authorizing the contract." McMurphy, 171 Vt. at 17, quoting Restatement (Second) of Contracts § 313(2). On the current record, the court cannot determine as a matter of law what was intended by the contracting parties.

Defendants argue that McMurphy requires two things: (1) an intent to benefit the third party, and (2) an intent to grant them a private right of action. Defendants read more into the case than this court does. McMurphy did not actually state that these are two separate requirements. Instead, it merely made a passing reference to a private right of action, but the entire focus of the Court's discussion was on the intent of the contracting parties. 171 Vt. at 16-17. This court reads McMurphy as saying that if the intent was to benefit the  third party, the third party has a private right of action.

Based upon the evidence presented, a jury could potentially find that "the circumstances indicate that the promisee [the City] intend[ed] to give the beneficiary the benefit of the promised performance," and thus that it is enforceable by Walker. Restatement (Second) Contracts § 302, Intended and Incidental Beneficiaries, Section (b) (Westlaw through Oct. 2013). See also, Dillon v. Reid, 717 S.E. 2d 542, 548 (Ga. App. 2011)(where site plan accompanying sale agreement specifically referenced planned location of dock, owner of dock was third-party

beneficiary); Peters v. Employers Mutual Casualty Co., 853 S.W. 2d 300, 301 (Mo. 1993)(one is a third-party beneficiary if the contract terms "clearly express" an intent to benefit that party). Thus, Defendants' motion for summary judgment on this claim will be denied. *Accord*, Oost-Lievense v. North American Consortium, P.C., 969 F. Supp. 874, 879 (S.D.N.Y. 1997)("plaintiff is specifically mentioned in the [contract] on four separate occasions. Such specific reference to plaintiff supports the conclusion that he is an intended beneficiary under the contract. Nevertheless, because this determination turns on a question of the parties' intent, the . . . resolution of plaintiff's status is, ultimately, a question of fact for the jury to decide.")(internal citation omitted).

### Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment in their favor on the third-party beneficiary claim. However, as noted above, the court cannot resolve the third-party beneficiary issue as a matter of law based upon the record to date. Moreover, even if Walker is such a beneficiary, the undisputed evidence before the court does not prove that "reasonable access to Walker Motors" was not maintained. These are questions for the jury.

### The Motion to Strike

Defendants move to strike the Plaintiffs' amended statement of material facts. The motion is denied.

### Acadia's Motion to Intervene

Acadia Insurance Company insures both the City and McDonald. It asserts that it is providing legal representation to them pursuant to "bilateral non-waiver agreements,"[6] and

---

[6] A bilateral non-waiver agreement "is assented to by both insured and insurer, and disclaims liability under the policy, reserves to each party his or her respective rights, and provides that the insurer will defend, at its own expense, and that nothing which is done under the agreement will be deemed to constitute a waiver of the respective rights." 14 Couch on Insurance § 202:38 (Westlaw through Oct. 2013). "When coverage is in doubt, an insurer

15

moves to intervene here to seek a declaratory judgment as to the applicability of its policy. Acadia alleges that the policy contains exclusions that may apply if it is established that Defendants "expected or intended harm" to Walker or Sierra, or if "property damage" arose out of inadequate work, delay, or breach of contract by McDonald. Motion to Intervene at 4.

Acadia first argues that it has a right to intervene because it has an interest relating to the subject of this action, the result of this case may impair or impede its interests, and no other party will adequately represent its interests. V.R.C.P. 24(a). Alternatively, it requests permission to intervene under V.R.C.P. 24(b) on the grounds that there are common question of law or fact between this case and their coverage concerns. Acadia argues that the Vermont Supreme Court has essentially directed insurers in situations such as this to intervene, citing Pharmacists Mutual Insurance Co. v. Myer, 2010 VT 10, 187 Vt. 323. The Court in that case discussed the possibility of intervention when an insurer wishes to assure that issues relating to policy exclusions are addressed in special jury interrogatories. Id. ¶¶ 15-16.

McDonald and the City oppose the motion. They argue that Acadia has a fiduciary duty to provide them a zealous defense, and that Acadia cannot also advocate before the same jury in a manner that would undercut that defense. Acadia has not responded to this argument, and the court is persuaded by it. Acadia has, by virtue of the non-waiver agreement, reserved the right to challenge coverage issues in a separate case. It may not, however, litigate in this case against the very insureds to whom it is providing a defense. *See, e.g*., Safeco Insurance Co. v. Tholen, 173 Cal. Rptr. 23, 33 (Cal. App. 1981)(finding intervention to undercut insured's position "could well be described as" a breach of the duty of good faith and fair dealing). Its intervention would also inject insurance coverage issues into the underlying case.

---

defending the insured under such an agreement notifies the insured of the conflict of interest, and reserves to itself all policy defenses in case the insured is subsequently found liable." Id.

16

Moreover, Rule 24 requires a "timely application" to intervene. V.R.C.P. 24. The motion is untimely, as it comes almost three years after this case began and at a time when the parties have already agreed to only ninety more days for discovery. 171234 Canada Inc. v. AHA Water Corp., 2008 VT 115, ¶¶ 19-20, 184 Vt. 633 (mem.).

Finally, the court does not consider the coverage issue to raise the same questions of law or fact that the existing dispute raises. Intervention would inject entirely new coverage issues into what is now a case involving claims of a taking and a breach of contract.

Nor does the court believe that Pharmacists Mutual requires it to grant intervention. That case merely suggested limited intervention for the purpose of requesting special jury interrogatories, not intervention as a full party seeking entirely new relief. Nor did it discuss the impact of non-waiver agreements such as the ones Acadia asserts exist in this case.

### Evanston's Motion to Intervene

Evanston Insurance Company has also filed a motion to intervene in this case to seek a declaratory judgment regarding the scope of its coverage. Its arguments essentially mirror those of Acadia. The court's analysis above applies equally here, and the motion is denied for the same reasons.

### Order

Defendants' motion for summary judgment is denied as to Count 1 (Taking), granted as to Count 2 (Negligence), granted as to Count 3 (Contract) with respect to Sierra Holdings, and denied as to Count 3 with respect to Walker Motors. Defendants' motion to strike is denied. Plaintiffs' motion for summary judgment is denied. Both motions to intervene are denied.

The scheduling order previously signed by Judge Bent in June requires the parties to mediate this case within 45 days of this ruling, and to complete discovery and be trial-ready

17

within ninety days of this ruling. The case will be scheduled for the April jury draw and a pretrial conference.

Dated at Montpelier this 30th  day of  December, 2013.

_____
Helen M. Toor
Superior Court Judge