Filed 05/01/24

| VERMONT SUPERIOR COURT | | CIVIL DIVISION |
|---|---|---|
| Washington Unit |  | Case No. 24-CV-00374 |
| 65 State Street | | |
| Montpelier VT  05602 | | |
| 802-828-2091 | | |
| www.vermontjudiciary.org | | |

---

**Christopher LaRose v. Grace Amao (fka Grace Amao Ciffo)**

---

<u>Ruling on Motion for Judgment on the Pleadings</u>

Plaintiff Christopher LaRose claims that the residential property he bought from Defendant Grace Amao was not as advertised.  Rather than the newly constructed "Clayton modular home" that he thought he was buying, he alleges that he received a "cobbled together old mobile home with numerous material defects."  His legal claims, as labelled, are (1) breach of contract (the purchase and sale agreement), (2) violation of the Vermont Consumer Protection Act (CPA), 9 V.S.A. §§ 2451–2466c; and (3) common law fraud.  Ms. Amao has filed a motion for judgment on the pleadings as to all claims raising various legal defenses.

I.      <u>Procedural Standard</u>

As the Vermont Supreme Court has explained, the question posed by a Vt. R. Civ. P. 12(c) motion for judgment on the pleadings, "'is whether, once the pleadings are closed, the movant is entitled to judgment as a matter of law on the basis of the pleadings.'  'For the purposes of [a] motion [for judgment on the pleadings] all well pleaded factual allegations in the nonmovant's pleadings and all reasonable inferences that can be drawn therefrom are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false.'  'A defendant may not secure judgment on the pleadings

if contained therein are allegations that, if proved, would permit recovery.'" *Island Indus., LLC v. Town of Grand Isle*, 2021 VT 49, ¶ 10, 215 Vt. 162, 169 (citations omitted).

Ms. Amao attached to her motion, and relies on, the purchase and sale agreement (P&S), the inspection report, and the seller's property information report (SPIR). The complaint refers to all three, and Plaintiff does not object to reliance on them here. These exhibits are part of the record for purposes of Ms. Amao's motion. *See Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 10 n.4, 186 Vt. 605, 609 n.4 (documents incorporated by reference into the complaint may be relied upon for dismissal purposes).

II.     The Complaint

The first challenge in this case is fairly interpreting the complaint. It consists of 24 paragraphs of factual allegations, some of which are vague and conclusory, followed by 3 summarily stated legal claims that reflect little effort at explaining which allegations are intended to support each claim's legal elements.

The general thrust of the complaint is clear, however: Mr. LaRose was led to believe that he was buying a newly constructed Clayton modular home when what he actually received was a "cobbled together old mobile home with numerous material defects." Alleged misrepresentations described in the complaint appear to include: (a) that the home was new; (b) that the home was modular; (c) that it was a Clayton home (referring to a particular modular home manufacturer); and (d) that the furnace/boiler was new. The representation that the house was new is alleged to appear in the listing agreement.[1] The representation that the house was modular is alleged to appear in both

---

[1] By listing agreement, Mr. LaRose presumably means the contract between Ms. Amao and the seller broker. It is unclear why Mr. LaRose would have been aware of the terms of the listing agreement. There is no express allegation that he was.

the listing agreement and the P&S. The representation that the furnace/boiler was new is alleged to appear in the SPIR. The representation that it was a Clayton home is attributed generally to Ms. Amao or her agent without further specification. Other issues that Mr. LaRose allegedly has experienced that do not clearly appear to be tied to any specific misrepresentations include: (1) the roof leaks; (2) the range/oven, dishwasher, and refrigerator were not new; (3) the foundation leaks; (4) the windows need to be replaced; and (5) "there is a problem with the subflooring in the basement."[2]

The breach of contract claim is described principally in ¶ 23:

> As per the parties' Purchase and Sales agreement, Plaintiff purchased what was represented to him by Defendant and/or her agents as a new modular home. After Plaintiff purchased the property, he came to realize that the property he purchased was not a modular home. It was a cobbled together old mobile home with numerous material defects.

In other words, the parties contracted for a new modular home and the actual home was neither. The ensuing paragraph 24, however, still under the breach of contract claim, provides: "These numerous issues as noted hereinabove constitute a breach of express and implied warranties of habitability as well as the implied covenant of good faith and fair dealing." There is no explanation as to what role any warranty of habitability might have in this case.[3] Nor is it clear what the breach of the covenant of

---

[2] It is possible, but by no means clear, that Mr. LaRose might intend that a misrepresentation that the house was "new" would necessarily extend to appliances in it even if there were no specific representations as to whether appliances were new or used.

[3] To the extent that Mr. LaRose may refer to the sort of warranty that may inhere in a construction contract with a building vendor, there is no such contract at issue in this case. *See Long Trail House Condo. Ass'n v. Engelberth Const., Inc.*, 2012 VT 80, ¶ 31, 192 Vt. 322, 336 ("[I]n cases involving the sale of a new house by a builder-vendor to a purchaser, the law would imply a warranty that the house was built in a good and workmanlike manner and was suitable for habitation."). Otherwise, there is a warranty of habitability that is both implied and imposed by statute in landlord—tenant

good faith and fair dealing might refer to when the claim is that Ms. Amao squarely failed to deliver what the contract promised. The Court infers that the intended breach of contract claim is as it appears in ¶ 23. If Mr. LaRose intended ¶ 24 to broaden the claim somehow, he has failed to plead sufficiently to provide basic notice of that broader claim.

The CPA claim is vaguely stated in the following paragraphs:

26. Defendant made material misrepresentations about the property she was selling to Plaintiff.

27. Plaintiff relied upon these misrepresentations when he decided to buy the subject property.

There is no express identification as to what specific misrepresentations are at issue under this claim, and there are no allegations describing how Mr. LaRose came to rely on any such misrepresentations. Again, the only clearly asserted misrepresentations in the complaint are: (a) that the home was new; (b) that the home was modular; (c) that it was a Clayton home; and (d) that the furnace/boiler was new.

The common law fraud claim appears in the following paragraphs:

30. Defendant's conduct as outlined herein above constitutes common law fraud as she either [knew] her statements were false as she did so intentionally, or she made them with a reckless indifference to the truth.

31. Plaintiff relied upon her false statements in deciding to buy the subject property as Defendant's false statements affected the essence of the transaction.

That is all this count says.

---

relationships, of which none is alleged in this case. 9 V.S.A. § 4457(a) ("In any residential rental agreement, the landlord shall be deemed to covenant and warrant to deliver over and maintain, throughout the period of the tenancy, premises that are safe, clean, and fit for human habitation and that comply with the requirements of applicable building, housing, and health regulations.")

The complaint makes reference to a home inspection report that had been prepared for a previous potential buyer of the property. There is no allegation either way as to whether Mr. LaRose was aware of the report, much less relied on it, prior to purchasing the property. Moreover, while the P&S reflects that Mr. LaRose waived an inspection, the complaint itself is completely silent as to what, if any, investigation he undertook prior to the purchase as to the nature and condition of what he was purchasing. The P&S also does not appear to have certain common liability limiting provisions, such as an as-is clause or a stipulating as to whether and to what extent the buyer may be relying on representations by the seller.

III.    Ms. Amao's Motion

Ms. Amao argues that she is entitled to judgment on the pleadings for the following reasons: (a) Mr. LaRose waived any claims as to defects and deficiencies; (b) the CPA claim fails because the transaction was not "in commerce" under *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, 195 Vt. 524; (c) the asserted good faith and fair dealing claim is duplicative of the breach of contract claim; (d) the economic loss rule bars the common law fraud claim; (e) the common law fraud claim fails because it was not pleaded with particularity under Vt. R. Civ. P. 9(b); (f) there can be no common law fraud in any event because the SPIR disclosed that the house was not a new modular home.

A.    Waiver of Defects and Deficiencies

Ms. Amao argues that Mr. LaRose expressly waived all defects and deficiencies, and that waiver extends to all her claims, presumably other than the CPA claim. *See* 9 V.S.A. § 2461(b) ("Any language, written or oral, used by a seller or solicitor, that

attempts to exclude or modify recovery of the penalty or reasonable attorney's fees [under the CPA] shall be unenforceable.").

As a contract matter, the P&S at ¶ 8 reflects that the contract is "subject to property inspection contingency." That paragraph further states, "If this Contract is subject to a property inspection contingency, the parties must execute a Property Inspection Contingency Addendum [emphasis removed] which shall become part of this Contract."

The inspection addendum reflects that Mr. LaRose elected to waive any inspection at all. The consequences of doing so are spelled out expressly in the addendum:

> Purchaser acknowledges the opportunity to request the inspections, tests and reviews set forth above and, after considering such opportunity, waives all rights to such inspections, tests, reviews or contingencies and agrees to hold Seller/s and all REALTORS® involved in this contract harmless from any claims for defects, deficiencies or inadequacies relating to the Property that could have been detected during any such inspection or review.

The off-the-shelf "inspections, tests and reviews set forth above" that Mr. LaRose could have requested include a general property inspection, radon and water tests, a heating inspection, a septic inspection, and a fireplace/chimney inspection. The general property inspection is very broad. It "may include, but shall not be limited to structural, mechanical, electrical, heating, plumbing, roof, foundation, water or septic/wastewater systems or improvements on the property." There is also an "Other" section, which would permit the parties to agree to other types of inspections or testing.

Ms. Amao argues that because Mr. LaRose agreed to hold her "harmless from any claims for defects, deficiencies or inadequacies relating to the Property that could have been detected during any such inspection or review," his claims—all of them—necessarily can have no merit. No doubt, to the extent that Mr. LaRose is merely grieving defects

and deficiencies that he reasonably could have discovered by having relevant inspections conducted, he has waived those claims.

To the extent, though, that reasonable inspections *would not* have uncovered those defects and deficiencies, by its terms, the waiver does not apply. Additionally, it is unclear how the waiver may affect the matter of modular construction. It is unclear whether modular construction is an open and obvious condition of the structure, would have been revealed only by unusual, invasive inspection techniques, etc. The full reach of the waiver is simply unclear at this early point.

More importantly, while the complaint describes defects and deficiencies, the Court understands the claims also to be fundamentally rooted in misrepresentation and fraud—that Mr. LaRose was promised a new, modular, Clayton home that did not exist. He does not appear to seek compensation for this or that mere defect but because he got duped into buying something that was actively misrepresented.[4]

The waiver in the addendum appears to be broadly calculated to immunize a seller from contract claims about mere defects and deficiencies. The parties have not analyzed how the waiver fits together with the elements of the tort claims, however, and that may well depend on the facts, which are few and far between at this stage of the proceedings. And the protection of the CPA is not waivable in this manner in any event. 9 V.S.A. § 2461(b).

---

[4] The thrust of Mr. LaRose's opposition filing is consistent with this view of the complaint.

Accordingly, though the waiver is broad and likely covers some of the contract claims at issue, it is not yet clear how it applies to all of the relief being sought by Mr. LaRose.

B.    Whether the sale was "in commerce" under *Foti Fuels*

Ms. Amao argues that the CPA claim fails because the transaction between the parties was not "in commerce" under *Foti Fuels, Inc*, 2013 VT 111, 195 Vt. 524.  She argues that the sale of a home by the homeowner necessarily does not occur "in commerce" and, thus, is not subject to Vermont's CPA.  Mr. LaRose argues that this sale was subject to the CPA because Ms. Amao held it as an investment rather than for her own residential purposes.

In *Foti,* businesspersons with an established relationship privately negotiated several agreements by which the defendant ultimately would acquire the plaintiff's several businesses.  Several years into the transition, the parties' relationship broke down, resulting in the lawsuit.  Defendant asserted, among others, CPA counterclaims "based on plaintiff's allegedly false promises to move to Arizona, to abide by the noncompetition agreement, and to sell the distributorship to defendant within three to five years."  2013 VT 111, ¶ 7, 195 Vt. at 530.  The trial court threw out the CPA claims because the transaction had not occurred "in commerce," and was not subject to CPA.

The Court affirmed, explaining:

[W]e hold that the "in commerce" requirement narrows the [CPA's] application to prohibit only unfair or deceptive acts or practices that occur in the consumer marketplace.  To be considered "in commerce," the transaction must take place "in the context of [an] ongoing business in which the defendant holds himself out to the public."  Further, the practice must have a potential harmful effect on the consuming public, and thus constitute a breach of a duty owed to consumers in general.  By contrast, transactions resulting not from "the conduct of any trade or business" but

rather from "private negotiations between two individual parties who have countervailing rights and liabilities established under common law principles of contract, tort and property law" remain beyond the purview of the statute.

*Id.*, 2013 VT 111, ¶ 21, 195 Vt. at 536 (citations omitted). In applying that ruling to the facts of the case, the Court further noted:

Here, the parties' transaction does not constitute a transaction "in commerce" for [CPA] purposes because it did not occur in the consumer marketplace. First, plaintiff held his offer out to defendant only, not to the public at large. Second, the transaction did not involve products, goods or services purchased or sold for general consumption, as those terms are generally understood, but rather the sale of an entire business from one party to another. Third, the transaction's high level of customization— which was achieved through particularly negotiated contract terms rather than boilerplate language—does not typically occur in the consumer marketplace.

*Id.*, 2013 VT 111, ¶ 25, 195 Vt. at 537–38 (citations omitted). The plaintiff in *Foti Fuels* was not in the business of selling businesses and never offered his own businesses for sale to the public. It was a strictly private transaction.

With little analysis, Ms. Amao argues that the sale of a home by the homeowner, as in this case, necessarily does not occur "in commerce" as described in *Foti Fuels*, and that Mr. LaRose cannot invoke the CPA. The Court declines to resolve this issue on the current record under subject to the Vt. R. Civ. P. 12(c) standard. *See Ass'n of Haystack Prop. Owners, Inc. v. Sprague*, 145 Vt. 443, 447 (1985) ("[C]ourts should be especially reluctant to dismiss on the basis of pleadings when the asserted theory of liability is novel or extreme."); 5C Charles Wright, et al., *Fed. Prac. & Proc. Civ.* § 1368 (3d ed.) ("A significant number of federal courts have held that the standard to be applied to a Rule 12(c) motion that challenges the legal sufficiency of a claim is identical to that used on a Rule 12(b)(6) motion based solely on the complaint.").

There can be no doubt that the CPA applies to the sale of real estate generally, 9 V.S.A. § 2453(e), and to real estate brokers, *Carter v. Gugliuzzi*, 168 Vt. 48, 53 (1998). Ms. Amao argues, however, that as between the selling owner and the buyer, the transaction cannot have occurred in commerce. She further asserts as a matter of fact that she is not in the business of selling homes because she has only sold 5 in her life.

*Foti Fuels* focuses attention on whether the transaction took place "in the context of [an] ongoing business in which the defendant holds himself out to the public" and whether the practice would be harmful to the consuming public. Such transactions are subject to the CPA. Transactions instead arising out of the parties' private negotiations, and which are reasonably subject to the "countervailing rights and liabilities established under common law principles of contract, tort and property law," fall outside the scope of the CPA.

An ordinary private homeowner who seeks to sell her residence by hiring a broker and listing the home publicly clearly is reaching out into the consumer marketplace and may make misrepresentations that would be harmful to consumers. Whereas the hired broker's conduct occurs as a part of the broker's ongoing business, however, the same is not necessarily true of the selling owner. Such a sale thus may well not be subject to the CPA. *See, e.g., Kelton v. Criterium Lalancette Engineers*, No. 469-8-18, 2019 WL 13172492 (Vt. Super. Ct. Jan. 07, 2019) (Hoar, J.) (concluding that a private home sale was not in commerce as between buyer and seller under *Foti Fuels*); see also Carter v. Gugliuzzi, 168 Vt. 48, 54 (1998) (discussing distinction between private seller and a realtor).

In this case, by contrast, the complaint is clear that Ms. Amao owned the home as an investment, not for ordinary residential purposes. She presumably bought the property and fixed it up to sell it and make a profit—a business endeavor. She is not necessarily in the same shoes as the hypothetical ordinary private homeowner. The circumstances may be such that the transaction took place in the course of some ongoing business of hers. Her factual allegation that she has sold only 5 homes in her life is not in the record under Rule 12(c), and the Court cannot consider it regarding the instant motion.

Whether the CPA applies to the transaction in this case is a novel issue, the parties have not briefed it in detail, and the facts are not yet established with clarity. The Court declines to resolve the matter at this time.

C.      The Good Faith and Fair Dealing Claim

Ms. Amao argues that Mr. LaRose's good faith and fair dealing claim is impermissibly duplicative of his breach of contract claim. As set forth above, despite the appearance of the expression *good faith and fair dealing* in the breach-of-contract section of the complaint, the Court is unable to discern such a claim. The covenant of good faith and fair dealing is an "underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208 (1993). It generally applies to the performance and enforcement of contracts; it "does not deal with good faith in the formation of a contract." Restatement (Second) of Contracts § 205 (1981). Outside of the clear contract claim that Mr. LaRose did not receive the modular home he contracted to buy, his claims all appear to arise out

of contract-formation interactions to the effect that he was misled. Otherwise, to the extent that Mr. LaRose is simply recharacterizing his breach of contract claim as a violation of the implied duty of good faith and fair dealing, the Court notes that doing so is a nullity.[5] *See Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 187 n.5 ("[W]e will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract based upon the same conduct.").

The motion for judgment on the pleadings is granted as to that potential claim.

D.     The Economic Loss Rule

With virtually no citation to relevant authority, Ms. Amao argues that Vermont's economic loss rule is a *per se* bar to  common law fraud claims seeking economic damages.[6] The Vermont Supreme Court has summarized the rule as follows:

> The economic loss rule "prohibits recovery in tort for purely economic losses." The rule serves to maintain a distinction between contract and tort law. As we have explained:
>
> > In tort law, duties are imposed by law to protect the public from harm, whereas in contract the parties self-impose duties and protect themselves through bargaining. Thus, negligence actions are limited to those involving unanticipated physical injury, and claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract.

*Long Trail House Condo. Ass'n v. Engelberth Const., Inc.*, 2012 VT 80, ¶ 10, 192 Vt. 322, 327. The upshot of Ms. Amao's argument would appear to be that common law fraud

---

[5] In his opposition filing, Mr. LaRose appears to agree that his good faith and fair dealing claim is based on the same conduct as his breach of contract claim.

[6] Surprisingly, Mr. LaRose did not respond to this argument in his opposition.

causing economic damages only has no remedy in Vermont unless a contract or contract law provides one.

In fact, the applicability of the economic loss rule to claims of fraud has been treated variously in different jurisdictions. According to one court: "It appears that three approaches to fraud claims have emerged: (1) there is no exception to the economic loss rule; (2) there is a general exception for all fraud in the inducement claims; or (3) a narrow exception exists where the fraud 'is not interwoven with the quality or character of the goods for which the parties contracted or otherwise involved performance of the contract.'" *Milan Supply Chain Sols. Inc. v. Navistar Inc.*, No. W201800084COAR3CV, 2019 WL 3812483, at *6 (Tenn. Ct. App. Aug. 14, 2019), *aff'd in part on other grounds*, 627 S.W.3d 125 (Tenn. 2021) (*quoting Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 217 (Wis. 2005)); *see also* Dan B. Dobbs *et al., The Law of Torts* § 615 (2d ed.).

Ms. Amao essentially argues that the no-exception-for-fraud permutation is the law of the land in Vermont. The Vermont Supreme Court has never addressed the matter, however. In 2010, the Second Circuit Court of Appeals certified a question to the Vermont Supreme Court to clarify precisely this issue, at least in the context of a negligent misrepresentation claim. It explained:

> The Vermont [Supreme C]ourt has repeatedly applied [Restatement (Second) of Torts § 552(1) (negligent misrepresentation)] in cases that sought only economic damages. But, in allowing such cases to proceed, the court has not discussed the economic loss doctrine at all.
>
> Despite these Vermont state precedents, the federal District Court for the District of Vermont, applying the economic loss doctrine, has barred negligent misrepresentation claims involving only economic loss on three occasions, including the instant case.

. . .

The District Court's resolution of the conflict between Vermont's seemingly broad recognition of the tort of negligent misrepresentation and its adoption of the economic loss doctrine is based, as the Court wrote in this case, on the notion that "[t]he policy considerations underlying Vermont's economic loss rule apply equally to tort actions for negligent representation." But while this is an understandable resolution of the issue, it runs directly counter to the result in four Vermont Supreme Court cases. For each of the cases . . . dealt with purely economic losses, and each found no bar to recovery.

As Plaintiff argues, "[i]f the economic loss rule is as pervasive in Vermont's jurisprudence as [Defendants] assert[ ], the Supreme Court of Vermont would not repeatedly award economic damages for negligent misrepresentation, knowing the economic loss rule would bar such an award." We do not follow Plaintiff to its conclusion that negligent misrepresentation claims are necessarily exempt from the economic loss doctrine. After all, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." But the cases are there and cannot simply be ignored. In view of their presence, on the one hand, and the lack of any discussion in them of the economic loss rule, on the other, we are left unable to conclude what Vermont law is as to purely economic loss caused by negligent misrepresentation.

. . .

Accordingly, we certify the following question:

Does the economic loss doctrine apply to claims of negligent misrepresentation?

*Hunt Const. Group, Inc. v. Brennan Beer Gorman/Architects, P.C.*, 607 F.3d 10, 17–18

(2d Cir. 2010) (citations and footnote omitted). Unfortunately for present purposes, the

Vermont Supreme Court dismissed the certified-question case before answering the

question. *Hunt Const. Grp. v. Brennan Beer Gorman, Architects, P.C.*, 24 A.3d 595, 2011

WL 3505522 (Vt. 2011).

Ms. Amao's argument that Vermont's economic loss rule altogether forecloses a

fraud claim seeking economic damages is substantially less than clear. The history is

that misrepresentation claims seeking economic damages have occurred in Vermont, apparently without anyone ever having raised the issue Ms. Amao has, and the Court has never resolved it. *See Sutton v. Vermont Reg'l Ctr.*, 2019 VT 71A, ¶ 31, 212 Vt. 612, 622 (citing with a "cf." *Limoge v. People's Tr. Co.*, 168 Vt. 265, 268–69 (1998), at least implying that negligent misrepresentation may be considered to be an exception to the economic loss rule in Vermont)). *See also Hunt Const. Group, Inc*, 607 F.3d at 17–18 (collecting cases from the District of Vermont invoking the economic loss rule under Vermont law); In any event, Ms. Amao has not analyzed this complicated issue in the context of an arms-length sale except in the most summary manner, and Mr. Larose has not addressed it at all. Nor does the briefing explore any potential differences that might exist in this context between a negligent misrepresentation claim and a fraud claim. In these circumstances, the Court declines to rule on this novel issue without the benefit of a more developed record.

E.    Particularity under Vt. R. Civ. P. 9(b)

Ms. Amao argues that she is entitled to judgment on the common law fraud claim because Mr. LaRose has failed to plead it with particularity. Mr. LaRose's response is as follows:

> [A] simple reading of Plaintiff's complaint demonstrates that Plaintiff did plead this count in detail, which was enough to provide Defendant with sufficient information to enable her to effectively prepare a response. Paragraphs 3–21 of Plaintiff's complaint, which were incorporated into the Common Law Fraud Count, do state in detail that Defendant and/or her agents misrepresented the property Defendant was selling as a modular home and not as what it really was, an old, dressed up mobile home. Since Defendant was responsible for the acts of her agents, she is responsible for the representations that were made by her and her agents in the written documentation and verbal statements referred to in Plaintiff's complaint that the property was characterized as a modular home when it was not.

Plaintiff's Response at 5 (filed March 12, 2024). To be clear, Mr. LaRose alleges essentially that "modular" is a term of art in the housing industry that connotes a high-quality form of construction that was highly misleading in relation to the sale of this home.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." As this Court has repeatedly emphasized, Rule 9(b) is a pleading standard. It is not a "rule of dismissal." *State v. Quiros*, No. 217-4-16 Wncv, 2016 WL 10860920, at *5 (Vt. Super. Ct. Dec. 13, 2016); *Thorpe v. Kingsbury Companies, LLC*, No. 424-7-16 Wncv, 2016 WL 10860912, at *2 (Vt. Super. Ct. Dec. 09, 2016); *US Bank Nat. Ass'n v. Breer*, No. 717-10-12 WNCV, 2015 WL 5311516, at *2 (Vt. Super. Ct. Aug. 03, 2015). As Wright & Miller explains, "Courts infrequently dismiss for a failure to plead with sufficient particularity under Rule 9(b), at least not without providing an opportunity to replead. To impose such a drastic sanction for a pleading defect arguably is at odds with the liberal approach the federal rules as a whole take to the pleading phase of litigation and could lead to injustice. Consequently, Rule 9(b) motions often yield no more than litigation delays or slightly amended complaints." A. Benjamin Spencer, *et al.,* 5A *Fed. Prac. & Proc. Civ.* § 1296 (4th ed.) (footnotes omitted). Ms. Amao has not sought clarification or a more definite statement of Mr. Larose's common law fraud claim. Instead, she is improperly attempting to leverage Rule 9(b) into judgment on the pleadings without first attempting to clarify it.

In any event, in briefing, Mr. LaRose clarifies that the common law fraud claim is based on the representation that the house was modular. The complaint is

straightforward in stating that the modular representation appears in the P&S, and it does. Paragraph 4(E) of the P&S allows for a further description of the property. "[A] 3 bedroom 2 bath modular home on 2.15 acres" is typed in. Ms. Amao presumably knows who was responsible for that language appearing there if not her. The Court accepts that as the scope of the fraud claim in this action.

The Court declines to grant judgment to Ms. Amao under Rule 9(b). If she believes she needs more detail as to the specifics of the fraud claim, she may take appropriate steps to cause Mr. Larose to produce them.

F.    Openness of Nature and Condition of the Home

Lastly, Ms. Amao argues that Mr. LaRose's fraud claim fails as a matter of law because the fact that the home was not new, not modular, and not a Clayton branded home was "open" to Mr. LaRose's knowledge and clear in the SPIR. "To maintain a cause of action for fraud, plaintiff must demonstrate five elements: "(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) *that was not open to the defrauded party's knowledge*; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed." *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 13, 200 Vt. 465, 472 (emphasis added).

On a more developed record, this argument may well prevail. The Rule 12(c) record, though, is insufficient to support such a ruling. Nothing in the complaint itself establishes as a matter of law that the actual status of the house was open to Mr. LaRose's knowledge. While Ms. Amao implies that Mr. LaRose would have known of that actual status of the home had he only inspected, the Court cannot make that determination on a cold record. He also asserts in briefing that it was not until after he

moved in that he came to learn that that the house was really an old trailer, implying that its nature as such was not obvious.

Ms. Amao does not explain in any detail what precisely in the SPIR should have clued a reasonable person in to the fact that the house was not new, modular, or a Clayton branded home. The closest the SPIR comes to addressing those matters appears at the end, above the parties' signatures. There appears a question as to whether there is anything else that should be disclosed about the condition of the property. The response typed in is as follows: "This home was constructed in 2019 and 2020 using mostly new but some recycled materials. Recycled materials were from a modular home on the property and include: most windows, some exterior 2x6's used for frame, and some subflooring." The representation here is that the house used materials from a modular home, not a trailer, and that some materials were recycled. At most, this answer on the SPIR suggests that the house was "mostly new" or a new house that simply incorporated some recycled materials.

The record needs to be developed before it might support any determination as a matter of law as to what reasonably was open and obvious to Mr. LaRose's knowledge.

### Conclusion

For the foregoing reasons, Ms. Amao's motion for judgment on the pleadings is granted, in part, and denied, in part.

Electronically signed on Friday, April 26, 2024, per V.R.E.F. 9(d).

Timothy B. Tomasi
Superior Court Judge